UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------X
                                   :
UNITED STATES OF AMERICA,          :  15-MISC-1
                                   :
                    Plaintiff,     :
                                   :  February 26, 2015
          v.                       :
                                   :  500 Pearl Street
ALEXANDER KHOCHINSKY,              :  New York, New York
                                   :
                    Defendant.     :
----------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          KATHERINE REILLY, ESQ.
                            Assistant U.S. Attorney
                            Southern District of New York


For the Defendant:          CHRISTOPHER FLOOD, ESQ.
                            Federal Defenders of New York
                            52 Duane Street - 10th Floor
                            New York, New York 10007




Court Transcriber:          SALLY REIDY
                            TypeWrite Word Processing Service
                            211 N. Milton Road
                            Saratoga Springs, New York 12866


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1        THE CLERK: <u>United States v. Alexander Khochinsky</u>,

2   Case No. 15-CR-MISC-1.

3        Counsel, please state your appearance.

4        MS. REILLY: Good evening, Your Honor. Katherine

5   Reilly for the Government.

6        THE COURT: Good evening.

7        MR. FLOOD: Your Honor, good evening. Christopher

8   Flood on behalf of Mr. Khochinsky.

9        THE COURT: Good evening.

10        Could I have the date and time of arrest, please?

11        MS. REILLY: Yes, Your Honor. The defendant was

12   arrested at approximately 7 a.m. this morning.

13        THE CLERK: State your name for the record.

14        THE INTERPRETER: Yes.

15        THE CLERK: Excuse me, Ms. Avrutin, you probably

16   haven't been sworn yet. Would you just state your name for

17   the record?

18        THE INTERPRETER: Isabelle Avrutin.

19        (Oath administered to the Interpreter.)

20        THE COURT: Mr. Khochinsky, the purpose of the

21   proceeding is to advise you of certain rights that you have

22   and inform you of the charge made against you, consider

23   whether counsel should be appointed for you, and to determine

24   under what conditions, if any, you might be released. Do you

25   understand, sir?

1          THE DEFENDANT:   Yes.

2          THE COURT:   You have a right to be released though

3  there is a presumption that no bail should be fixed in a

4  matter such as this.   You have a right to remain silent.

5  Anything that you do say can be used against you.

6          You have a right to be represented by counsel during

7  all court proceedings and during all questioning by

8  authorities.   If you're unable to retain counsel, the Court

9  will appoint counsel to represent you.   In that connection I

10  have before me a document labeled financial affidavit, which I

11  shall show you now.   Do you recognize the document?

12          THE DEFENDANT:   Yes.

13          THE COURT:   Would you raise your right hand, please?

14          (Oath was administered.)

15          THE DEFENDANT:   Yes.

16          THE COURT:   Thank you.   I'm going to appoint Mr.

17  Flood to represent you.   The information provided through the

18  affidavit suggests to me that you're without the means to

19  retain counsel.

20          If you have made false statements through the

21  affidavit, you may expose yourself to a new charge in

22  connection with the false statement.   If your financial

23  circumstances change and you're able to retain counsel, you

24  should advise the Court of your changed circumstance.

25          You are here today based upon an application by the

1  Republic of Poland through diplomatic channels that you be
2  arrested and extradited to that country.

3  Mr. Flood, have you received a copy of the complaint
4  and the accompanying materials?

5  MR. FLOOD: I have, Your Honor.

6  THE COURT: Do you wish to have the complaint read
7  to your client in open court?

8  MR. FLOOD: No, we don't, Your Honor. I've
9  discussed it with him with the assistance of a Russian
10  language interpreter.

11  THE COURT: Very well. This extradition matter in
12  the first instance is within the jurisdiction of the Part 1
13  Judge, who may retain the case or determine to have it
14  referred to a Magistrate Judge for all proceedings. The
15  Part 1 Judge, Judge Rakoff, has determined to retain
16  jurisdiction of the matter. So at the conclusion of this
17  proceeding I will direct the parties to contact Judge Rakoff's
18  chambers for a schedule for proceedings going forward.

19  Mr. Khochinsky, you're entitled to have a hearing
20  before the assigned judge at which evidence of criminality may
21  be presented. If it is determined by that judge that
22  sufficient bases exist to establish that an offense has been
23  committed within the parameters of the treaty between the
24  United States and the Republic of Poland, then a warrant will
25  issue for extradition and you will be forwarded to the

5

1 Republic of Poland. If such information is not presented to
2 that judge to his satisfaction, then the extradition will not
3 go forward.

4          I indicated earlier that there is a presumption
5 against the issuance of bail conditions in an extradition
6 proceeding. Do parties want to be heard on the issue of bail?
7          MR. FLOOD: We do, Your Honor.
8          THE COURT: All right. I'll hear from the defendant
9 first on this application for bail.

10         MR. FLOOD: Your Honor, we firmly believe that
11 holding Mr. Khochinsky in this case in this posture would be a
12 substantial injustice. He is an aged man with serious health
13 issues. He takes a number of medications. He was pulled from
14 his home this morning without warning. And the nature of
15 these allegations from the Republic of Poland are reduced in
16 this complaint to a one-sided story that are oversimplified
17 and highly, highly prejudicial, unfairly prejudicial to Mr.
18 Khochinsky.

19         The story of what actually involves this painting
20 and its history does begin, in my understanding, in World
21 War II. But to understand it you have to understand the
22 history of this man's family. It is my understanding from the
23 Government's documents and from the allegations here that the
24 painting, somehow its provenance was interfered with by the
25 invasion of the Nazi armies into Poland in the '40s. We don't

6

1   take a position on that and we don't think that needs to be
2   resolved here today.  It's certainly not a question for bond.

3          But I want to draw the Court's attention to Chapter
4   209 when we talk about extradition and why it would go back
5   that far and why begin here to talk about bond.  Because in
6   Chapter 209 all of the complex questions about how we deal
7   with international relations when we're talking about
8   fugitives and what the country should do, what the courts of
9   this country should do when we're asked to respond to the
10  detention of a fugitive are captured in that chapter.  And
11  none of it fairly is reflective in the documents that apply in
12  this complaint and to the history of this man or his family.

13         Number one, Mr. Khochinsky -- I'm going to
14  mispronounce the gentleman's name -- Khochinsky is not a
15  fugitive.  He's been living openly in the United States for
16  years since he came here fleeing Russia.  He came to the
17  United States and sought to become an American citizen.  He's
18  an art dealer and always has been.  He does have a trade in
19  Russia in art, but he also has a trade here -- sorry, a home
20  here and a collection of art here.  And he's been in contact
21  with the Republic of Poland about this very painting.

22         The way that that is described in the complaint is
23  misleading.  It's made to look like he was -- there was some
24  kind of -- frankly, my reading of it it looks like as if it's
25  blackmail, I have this painting and then he disappears.

1  That's simply not the case.  This man, this family has been in
2  possession of that painting for a very, very long time.  I'll
3  come back to that in a moment.

4          But Mr. Khochinsky's family and Mr. Khochinsky
5  himself came from Russia some years ago to settle in New York
6  openly.  They've no -- had reason to believe to find him here
7  because he brought property here, he's been living under his
8  name.  His -- the picture that's in the complaint here my
9  understanding is was published in the New York Times.  Because
10 it's -- he's an art dealer.  He's not been hiding.  So to call
11 him a fugitive is really tremendously overstating the case,
12 number one.

13         Number two, Chapter 209, all of the provisions there
14 have this amazingly clear escape clause or margin where they
15 say none of these provisions shall apply in a case where
16 there's a political prosecution.  None of them.  And that
17 really does seem to be what's going on with Mr. Khochinsky's
18 prosecution in Poland.  That really does seem to be what's
19 happening here.  And so to really make my point I have to get
20 deeper into the history of Mr. Khochinsky's family.

21         He comes from the village -- I'm not going to be
22 able to give the Court the name, I'm simply going to
23 mispronounce it, but the village his family originates from
24 was obliterated by Nazis and right wing forces in Poland in
25 the '30s and '40s.  His mother and his grandmother were some

1  of the only survivors.  If I'm not mistaken, his mother might
2  have been the only survivor.  They were of the Jewish
3  community in that village.  The only survivor.  The rest were
4  victims of the Holocaust.

5          And so he and -- he immigrated to the -- his
6  predecess- -- his mother immigrated to Russia.  He was born in
7  Leningrad.  And the Polish government has never taken
8  reparations for what happened during the Holocaust seriously.
9  And it's known, it's a known historical fact that the Polish
10  Jewish community after the Holocaust has never recovered its
11  numbers.  It's just never recovered anything like what a
12  vibrant community it was before that horrible historical
13  experience.

14          And Mr. Khochinsky was in discussions with the
15  Polish government saying it's time for you to take this
16  seriously.  My family and other families need to have our
17  property, our homes, our family members -- it's time for us to
18  have reparations for that.  And there was some exchange, and I
19  believe we're prepared, we will be, because we have very
20  little preparation today, but the preparation to be able to
21  show that in a fair hearing, in a fair court hearing, that
22  there was an exchange between the Polish government of the
23  Republic of Poland and Mr. Khochinsky about reparations for
24  that experience.

25          And, frankly, the provenance of that painting that

1  is accused of Mr. Khochinsky knowing that it had been stolen
2  from the Republic of Poland, we don't grant that accusation
3  any merit whatsoever.  This family had been run out of Poland
4  for fear of their lives by the Nazis and the right wing forces
5  that were in control of Poland at that time.

6          That they somehow ended up in possession of this
7  painting is, frankly, just a historical fact, but how they
8  came about it can hardly be accused of being the thieves of
9  the painting.  They very well could have bartered it for  a
10  loaf of bread at that time, that part of the world at that
11  moment in history.

12          But whether he was going to exchange that painting
13  or whether return that painting to the Republic of Poland for
14  -- that was going to be part of an exchange for Poland taking
15  reparation seriously for his family or some other family was
16  above board and there were open discussions about that.  And
17  as the complaint shows Mr. Khochinsky allowed a Polish art --
18  I don't know if it's an actual Polish art authenticator but
19  someone that had been identified by Polish authorities to come
20  and authenticate the painting.  This was an open transaction.
21  They came and they authenticated the painting themselves.  And
22  then those negotiations broke down totally.

23          And coextensive with that Mr. Khochinsky's
24  relationship with the Russian government broke down totally as
25  well.  Which, by the way, somewhere around 2008, if I've got

10

1  the years correct, happens to be some -- it's part of the
2  breakdown in the international economy, the crashing of the
3  Russian ruble, the rise of the Putin's government
4  repressiveness.  And that's when he came to the United States.
5  There's a lot of things going on here that has absolutely
6  nothing to do with Mr. Khochinsky, there are big gigantic
7  economic forces, and that's had -- that do not support these
8  allegations of wrongdoing.

9         And so now the Polish government says you've stolen
10  this painting and we want to have you jailed and extradited.
11  We're prepared to fight this or at least explore his legal
12  options here.  The question is whether this man must be jailed
13  in the meantime.  It is an extraordinary case, quite
14  obviously.  This is not a question of drug dealing or arms
15  dealing or terrorism or some other kind of -- I mean the
16  enumerated list of the type of cases, you know, any kind of
17  like larceny or God knows what else that the word fugitive
18  calls to mind.  That is just not what's happening here.

19         This man is going to return to court.  We will
20  secure his presence with his property, which is all he owns in
21  this world.  He owns the property that he bought when he came
22  to the United States and the art that's within it.  We're
23  happy to secure -- as we put in the affidavit, we will secure
24  his return to court with that property.  We recognize that
25  this is a unique posture, a fairly unique case.  The court

1   doesn't see it every day.

2           But again his medical condition, his age. The
3   Pretrial Services report reads in every way like someone who
4   should be released until the very last line where it says
5   recommendations, there's no conditions of release. It's
6   simply the function of the statute that's saying that he
7   shouldn't be released.

8           If we assess the assessment of nonappearance,
9   limited family ties to the United States. Well, his wife and
10  his son are here, his closest family are all here. He can't
11  go back to Russia where he's actually fleeing that country to
12  come here and try and become a United States citizen. This is
13  his home. He's trying to live out his days in the United
14  States. The lack of verifiable legitimate employment. The
15  man is an art dealer, he's basically self-employed but at this
16  stage in his life he's retired. Ties to a foreign country are
17  all historical. He's an immigrant. And unexplained assets, I
18  just don't even know what to make of that. I mean he's been
19  an art dealer. That's the explanation for the assets.

20          So I mean the story here is much more than has been
21  set forth. And I do -- there's only so far I can take this,
22  but the affidavit that's set forth by the United States is
23  really a translation of the affidavits that are set forth by
24  the Republic of Poland's, the equivalent I take it as a
25  warrant. And I'll take that for the purposes of today's

1 hearing only where I guess it's the decision of arrest.

2 But it is so terribly one-sided and it does smack of

3 a political decision in light of everything that else we know

4 about Mr. Khochinsky's personal history. It would be one

5 thing different if he had ties, for example, to Nazi art

6 thieves. He's exactly the opposite. His family are victims

7 of the Holocaust seeking reparations from the Polish

8 government that were being denied that. And instead those

9 negotiations broke down and they've, now the Polish government

10 is attacking him seeking, a victim of the Holocaust seeking

11 return of what they claim to be Nazi art.

12 It's an incredibly paradoxical set of facts. And

13 the question of bond, there's zero danger to the community

14 here, zero. It is simply one of flight risk and it can be

15 secured by securing his assets. And so unless the Court has

16 questions -- I know it's a complicated set of facts and I've

17 been as clear as I can be -- that's all I have to present.

18 THE COURT: What are these assets and what is the

19 value of the assets that you're referencing?

20 MR. FLOOD: So the assets are he's been an art

21 collector for basically his whole life, and when I say

22 collect, art dealer. But it's Russian paintings. The

23 question of their value is really -- we've had some discussion

24 about this, and it's really uncertain. They would have to be

25 put up for auction to really determine what their value is.

13

1   And the question of the value of these twentieth century
2   Russian painters, the market changes. And it is a question
3   right now at this point in political history how attractive
4   those painters are. And our thinking is that it's probably
5   the  bottom of the market right now. It's not like he -- if
6   he -- he thinks if he was to sell them right now he would get
7   like bottom dollar for them.

8           So in terms of -- the way we see it there's two
9   concerns that are appropriate for this particular issue. One
10  is, you know, in terms of securing his return to court and
11  then, of course, the -- we think incredibly unlikely but
12  always ambient concern like could he convert them into some
13  kind of treasure chest and flee.

14          Like addressing the latter concern first, we don't
15  think, no, we don't think that's possible. Because there's
16  just not a great market for Russian art right now. But then,
17  secondly, how one would secure that, I mean we could
18  potentially think of putting them in escrow or something like
19  that so that they just wouldn't be convertible or, you know,
20  just turning over title or something like that. Personal
21  property like this presents a little bit of a conundrum in
22  terms of how to inventory it and then secure it.

23          But in an effort to be exhaustive about what his
24  assets are, that is an asset. He does have a collection of
25  paintings. But they are -- it's not like they're Caravaggios

14

1   or Picassos or something as well known.  They are sort of --
2   they're just not -- they're just esoterically for the New York
3   market not a really well-known set of artists.

4            THE COURT:  Well, everything that you've said about
5   this art is so vague with respect to valuation.  Your client
6   is an art dealer, he should be able to value the art that he
7   has.  You say it's at the bottom of the market.  All right, if
8   a piece of art in a good market is worth $40 million but in a
9   bad market is worth 15 million, that's interesting to know.

10           MR. FLOOD:  Right.

11           THE COURT:  For the 15 could be the bottom of the
12  market, but that's still a significant number.

13           MR. FLOOD:  Sure, and --

14           THE COURT:  But you've not placed a number on
15  anything.

16           MR. FLOOD:  Well, we have.  Because it's in the
17  Pretrial Services report, and it's --

18           THE COURT:  Well --

19           MR. FLOOD:  -- in terms of what the expectation of
20  the value as they are here.  And it's also, Your Honor -- I
21  don't mean to cut the Court off.  But in terms of there's
22  another feature of what they're worth, and it's geographic.
23  Because I would think that for those painters, that they're
24  more popular in Russia than they are here.  And this
25  gentleman's ability to go to Russia, first of all, his

1   passports, he's not going to Russia because they've been
2   seized. And he has no interest in going to Russia because
3   he's fleeing the country, so it's doubly impossible for him.

4          And but thirdly the ruble has crashed. So that's --
5   so the art market in Russia has dried up on top of it. And,
6   you know, fourthly, to the extent that -- this is what I meant
7   about political earlier -- that if there was an international
8   art market in Russia maybe five years ago or 10 years ago, at
9   the sort of height of the Russian bear market, if you will,
10  that has, in my discussions with Mr. Khochinsky, dried up.

11         I'm sorry I can't be more precise. We would need
12  some expert testimony on this, I would think, to really get
13  down to what these values truly are. But --

14         THE COURT: Your client's an expert, he's an art
15  dealer, you keep telling me that.

16         MR. FLOOD: Sure.

17         THE COURT: He should be able to value the art and
18  tell you a number.

19         MR. FLOOD: And this is --

20         THE COURT: But you've given nothing with respect to
21  numbers. So you refer me to the Pretrial Services report. It
22  does not talk about artwork, it says that your client has
23  personal effects, undefined, and a value was placed on that.
24  So your client was able to place a value on something he
25  described as personal effects. He's an art dealer, he should

1 | be able to place a value on art.

2 | MR. FLOOD: Well, if I can confer with him for --

3 | THE COURT: Please do.

4 | MR. FLOOD: Thank you.

5 | (Counsel and defendant confer.)

6 | MR. FLOOD: So if I could, Your Honor. Talking at

7 | further length with Mr. Khochinsky about his thoughts about

8 | the valuation of his collection, I've struggled to add more

9 | flesh to the structure that I was giving Your Honor before.

10 | What I can tell you is that there's aspirational hope with a

11 | appraiser that the whole collection would come in somewhere

12 | between two and $3 million. But again that's not concrete.

13 | THE COURT: All right.

14 | MR. FLOOD: That's -- we don't have that as a --

15 | it's not like a receipt that we could hold up or, you know,

16 | there's not a Blue Book for this kind of thing.

17 | THE COURT: All right. Thank you. Anything else in

18 | connection with your presentation or may I hear from your

19 | adversary?

20 | MR. FLOOD: No, unless the Court has other

21 | questions.

22 | THE COURT: All right.

23 | Ms. Reilly?

24 | MS. REILLY: Your Honor, as you know, the

25 | presumption in this case is again the granting of bail. And

1  the circumstances in which bail is granted in an extradition
2  matter, to quote the case law, and this is United States v.
3  Leitner, which is the Second Circuit decision from 1986, "it's
4  only in the most pressing circumstances and when the
5  requirements of justice are absolutely peremptory."

6        And the reason articulated in Leitner and the
7  Supreme Court decision on which it's based for that high
8  standard and the presumption against bail is different than in
9  a normal case where you would consider factors specific to the
10 defendant.  In a case like this one involving extradition the
11 rationale for that principal is the obligation of the United
12 States to comply with its obligations under international
13 treaties, including, as relevant in this case, its mutual
14 legal assistance treaty with Poland and the difficulty of the
15 United States complying with its obligations under those tries
16 should be bail be granted in this type of case.

17       The special circumstances which courts have required
18 in the rare cases where bail is granted on an extradition
19 application are just not present here in the Government's
20 view.  To give one recent example, Judge Moss in 2009
21 considered a bail application and some of the same factors
22 that defense counsel has gone through.  That was in the
23 extradition of Garcia, it was a matter out of the Philippines
24 involving a kickback theft scheme.

25       And there the court considered the complexity of the

1  underlying proceedings and the factual issues presented and
2  the likelihood that hashing those proceedings out on the
3  extradition hearing would take a substantial amount of time.
4  He considered the fact that the risk of flight was very
5  slight, he considered the specific difficulties of confinement
6  imposed on that defendant, and he considered that in that case
7  the defendant was a United States citizen.  And even under
8  those circumstances Judge Moss denied an application for bail.

9          Here the defense has articulated some of those same
10  concerns but the factors, the circumstances are much less in
11  favor of overcoming the presumption against bail that's
12  present.  Mr. Khochinsky has substantial overseas ties.
13  Though he did leave Russia a few years ago, his wife, as set
14  forth in the Pretrial Services report, continues to own a
15  gallery or antique store in Moscow and has that asset in
16  Russia.  In addition, the defendant noted in the Pretrial
17  Services interview that he himself has traveled
18  internationally multiple times since he relocated to the
19  United States.  And obviously the fact that he lived abroad
20  until very recently notes that he does have substantial ties
21  outside of this area.

22          He also has substantial assets.  Most notably -- and
23  again this is in the Pretrial Services report -- in 2009 the
24  defendant purchased outright, without a mortgage, a $2.3
25  million apartment in Manhattan.  I understand that he has a

1  substantial art collection.  While it might be difficult for

2  him to liquidate those assets, it certainly suggests that

3  there are resources at his disposal should he choose to flee.

4       And I think the bulk of defense counsel's

5  presentation really dealt with this question of the underlying

6  facts here.  And I would note that, to rely on the decision I

7  mentioned earlier, the complexity of the facts in the

8  underlying proceeding may be something to be considered at an

9  extradition hearing but here do not constitute the kinds of

10  special circumstance that would counsel in favor of bail.

11       To just take a few issues with some of the things

12  that defense counsel said about the underlying facts, to this

13  idea that the defen- -- Mr. Khochinsky is not a fugitive,

14  while he may or may not have been aware of the arrest warrant

15  that was issued in Poland, he was certainly aware that Poland

16  had issued a restitution order seeking the return of this

17  painting.

18       In fact, I understand that he saw the painting on an

19  Interpol site and that's what prompted him to contact the

20  Polish government in the first place.  He, knowing that, based

21  on his statements to the arresting agents this morning, seems

22  to have sold the painting full aware that Poland had issued an

23  order seeking its return and to have left Russia subsequently.

24       You know, to the idea that he participated in the

25  authentication process and in a dialogue with the Polish

1  government, again based on the statements he made this
2  morning, he wasn't there for the authentication of the
3  painting, which took place at the gallery in Moscow.  And I
4  think the idea that he was engaged in negotiation about the
5  return of the painting may be somewhat overstated.

6         In terms of this question of his family history and
7  how he acquired the painting, his wife, in speaking to the
8  officers this morning, made statements to the effect that
9  though she has known Mr. Khochinsky since 1991, she did not
10  see the painting at issue until it was displayed in his
11  gallery in 2001.

12         And additionally even in the defendant's own
13  accounting of the painting's provenance that it was, as I
14  understand it, something that his father obtained after
15  serving in the military during World War II, it's not clear to
16  the Government how that fact and the fact of his mother being
17  left without possessions after World War II, again long before
18  Mr. Khochinsky was even born, how those two things are
19  related.

20         And the idea that Mr. Khochinsky was engaged in some
21  kind of ongoing dialogue about reparations to be paid by the
22  Polish government on the basis of the hardships suffered by
23  his mother and her community I think are separate from the
24  fact that Mr. Khochinsky was aware that this painting had been
25  obtained under circumstances that were improper, was aware

1  that the Polish government had issued legal process seeking
2  its return, and nonetheless either sold it or concealed it and
3  left Russia to come to the United States.

4           So I think at the outset the fact that these are
5  unusual proceedings, as Mr. Flood noted, does not mean that it
6  is -- should be more likely or is particularly special
7  circumstance which counsels in favor of bail.  And I also
8  think that the factual back and forth about what took place
9  here may or may not, frankly, be appropriate for an
10 extradition hearing but is not properly considered here where
11 the real question is whether these most pressing circumstances
12 overcome what is a very clear presumption against bail.

13          And all that said, I'm happy to answer any questions
14 the Court may have.

15          THE COURT:  Anything else on behalf of the
16 defendant?

17          MR. FLOOD:  I do.  I'm sorry, Your Honor, but I'm
18 constrained to reply.  The fact of the matter is this.  They
19 are exactly what is supposed to be taking place in a hearing.
20 If we look at the statute, this is not a may or may not kind
21 be the kind of situation.  This is -- in the statute 31 --
22 18-3184, the court is supposed to consider --

23          THE COURT:  Which provision are you referencing?
24          MR. FLOOD:  I'm sorry.  This is 18-3184 under
25 Chapter 209, the extradition provision of our Code of -- of

1  our Title 18.

2         THE COURT:  Yes, but it describes various processes

3  depending upon different contingencies.

4         MR. FLOOD:  Right.  So --

5         THE COURT:  I'm trying to have you direct me to the

6  precise section --

7         MR. FLOOD:  Yes.

8         THE COURT:  -- that you're focusing on.

9         MR. FLOOD:  So under 3184, fugitives from foreign

10  countries in the United States, which again we take some

11  umbrage at calling Mr. Khochinsky a, quote unquote, fugitive,

12  but after -- the statute goes on for some sentences setting

13  forth the predicate, saying when a foreign country has issued

14  a warrant a court of the United States -- it goes on to say

15  under 3181(b) somewhere in the middle there, at the end of the

16  sentences "the person is -- may be brought before a justice or

17  judge or magistrate to the end that the evidence of

18  criminality may be heard and considered."

19         That's the whole point.  Right?  This is the

20  evidence of what criminality there may have even been.  And

21  our position is there's no crime here.  None.

22         THE COURT:  Yes, but that section is focusing on the

23  hearing that Judge Rakoff will hold --

24         MR. FLOOD:  I --

25         THE COURT:  -- down the line.

1    MR. FLOOD: I fully understand. But it must be
2   considered, that has to be considered in light of the
3   detention question as well. Because if there's no crime --
4   and this is why my first words were it would be a substantial
5   injustice to detain a man who's aged and infirm, who's here on
6   open -- for like not a fugitive, not running from any kind of
7   criminal activity, here under his true name seeking American
8   citizenship.

9    Contacted the Polish government to say, hey, I have
10   this painting that you're looking for. Himself. The
11   Government just told you that. Initiated the discussions with
12   them. Began the process himself. Those discussions broke
13   down and then the Polish government is now saying we're coming
14   to get you because we don't like the way that those
15   discussions ended. And now we're going to detain him because
16   of the mechanisms of this statute. Now, the statute has an
17   escape clause that says, no, you don't -- it's not in every
18   case. And this is the case where it's not necessary.

19    Now, the case that's cited by the Government, the
20   Judge Moss case, it's a, you know, a pay for, a kickback
21   scheme. There's no scheme here. There is no crime here.
22   This man owned that painting under circumstances that his
23   father from the end of World War II. Now, I take great
24   umbrage at the Government's poo-pooing - I don't know of any
25   other way to say it -- his mother's survival of the Holocaust

1   and saying that that's not connected here.  I'm sorry, it is.

2           And it's deeply, emotionally connected to this man's

3   connection with that painting, saying I'm not about to give

4   the Polish government this painting without their

5   acknowledgment of my family's suffering.  That's why he's--

6   this prosecution is political.  That is why when they say

7   we're not about to pay attention to that, he's saying I'm not

8   having further discussions with you at all.

9           And yet it says in the complaint that he ignored

10  their request?  That ignoring is saying, yeah, your

11  government, the way you're handling this is not legitimate.

12  And that is a legitimate perspective.  Given what his family

13  and his community went through, that is extraordinary.  This

14  prosecution from Poland is extraordinary.  And the

15  Government's temerity is extraordinary.  And to detain this

16  man is extraordinary.

17          Your Honor, it must be said that this family asked

18  me if they would get better justice by calling the Russian

19  embassy.  Today.  If they should seek recourse from the

20  Russian authorities.  That is the nature of what is happening

21  here, going up to 10,000 feet and looking down at what's

22  happening here.  So yes, the operation of the statute is

23  highly intricate, and the standards are very severe.  I

24  acknowledge that.  But the justice of this question is

25  profound.

1          And this is a man who, by the way, has no ability to
2    flee because the Government has his travel documents.  We're
3    offering to secure his return to court, which I understand is
4    on Tuesday, with every penny he has.  The family can't flee
5    because they've -- the Government for some reason when they
6    came to arrest him took his entire family's travel documents,
7    his wife and both of his children, one of whom is disabled.  I
8    have never seen that in my entire career.

9          They have all -- honest to God, that's important.
10   Through the court to have the Government explain why all of
11   the family's travel documents are in the possession of the
12   Government today.  He is the one who is being detained today.
13   But that is the kind of intervention that has been taking
14   place here.  They're not able to do anything.

15         They're going to be in back in court to face this
16   challenge.  They do not think that this effort on the part of
17   the Polish government is legitimate.  But there's absolutely
18   no need to detain him on during the course of these
19   proceedings.  And again no allegations of true fraud, theft,
20   violence, drugs, anything that would give true cause here.  So
21   with that I rest.

22         THE COURT:  Was Mr. Khochinsky advised that the
23   Russian consular office be notified of his circumstance?
24         MS. REILLY:  Your Honor, I don't know if Mr.
25   Khochinsky was so advised, but I can tell the Court that

1  consular notification was made this afternoon.   The U.S.
2  Marshal Service who effectuated the arrest attempted to call
3  the Russian consulate 37 times and did not receive an answer.
4  They faxed consular notification at I believe between 3:00 and
5  4:00 p.m. this afternoon and received confirmation that the
6  fax had gone through.   So consular notification was made in
7  that manner.

8         THE COURT:   The defendant's counsel has alleged that
9  travel documents of the defendant's family members were
10  seized.   What information, if any, can you provide me about
11  that?

12        MS. REILLY:   Your Honor, I don't know why that took
13  place.   I do believe it is the case, and I will work -- that
14  the documents are in the possession of the Marshal Service and
15  we can work to effectuate their return to Mr. Khochinsky's
16  family as quickly as possible.

17        THE COURT:   All right.   Please attend to that as
18  rapidly as possible.   As far as I know, no member of his
19  family has been charged with anything, and there should be no
20  reason to constrict their ability to move about freely
21  wherever they want to move or travel.

22        MS. REILLY:   Yes, Your Honor, we'll do that.

23        THE COURT:   I indicated earlier in the proceeding
24  that there is a presumption against the fixing of bail and the
25  permitting a person to be at liberty when an extradition

1   proceeding is at play, such as the case here.  And as counsel
2   for the Government indicated, there has to be a finding of
3   special circumstances to beat back the presumption against
4   allowing someone whose extradition is sought to be released on
5   bail conditions.

6          The presentation made by the defendant in many
7   respects is vague and does not provide the Court with special
8   circumstances that distinguish this case from the circumstance
9   where there should be no bail because a presumption attends.
10  Accordingly, I'm going to direct that the defendant be
11  detained without bail.  Of course he is free to make an
12  application before Judge Rakoff at any time to have his bail
13  stay revisited as the extradition proceeding moves forward.

14         Has Judge Rakoff set a time for the parties to
15  appear before him in connection with this matter?

16         MS. REILLY:  He has, Your Honor.  He set a
17  conference for next Tuesday at 2 p.m.

18         THE COURT:  Mr. Khochinsky, you'll be held without
19  bail at least until the proceeding before Judge Rakoff on the
20  3rd of March, 2015.

21         Is there anything else that we need to address?

22         MR. FLOOD:  Yes, Your Honor.  Mr. Khochinsky takes
23  somewhere in the neighborhood of ten separate medications.  I
24  need to confer with his wife to identify what those are.

25         THE COURT:  If you can also identify the dosage and

1  the frequency of doses, that would aid me tremendously.

2  MR. FLOOD:  If I could trouble the deputy for a

3  medical req, and I will need the assistance of the Russian

4  interpreter too.

5  THE COURT:  Just write it on a --

6  MR. FLOOD:  [Indiscernible].

7  THE COURT:  -- and I'll complete an order.

8  (Pause)

9  THE COURT:  Mr. Flood, are the medications all for

10  the conditions reflected at page 3 of the Pretrial Services

11  report?

12  MR. FLOOD:  That is my understanding, Your Honor,

13  between the heart attack and the stroke.

14  (Pause)

15  THE COURT:  All right, Mr. Flood, I prepared a

16  medical order for your client.  Is there anything else that we

17  need to address?

18  MR. FLOOD:  Not at this time, Your Honor.

19  THE COURT:  Anything else from the Government?

20  MS. REILLY:  No, thank you, Your Honor.

21  THE COURT:  All right.  Thank you.  Good-night.

22  (End of hearing.)

23

24

25

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5                                  _____

6                                        Sally Reidy

7    Dated:    March 4, 2015

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25