UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
                                 :
                                 :

IN THE MATTER OF THE            :
EXTRADITION OF ALEXANDER    :         15 CRIM. MISC. 1
KHOCHINSKY                    :
                                 :
                                 :

------------------------------------------------ x

## RESPONDENT ALEXANDER KHOCHINSKIY'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS

Federal Defenders of New York
Attorneys for Defendant
**Alexander Khochinskiy**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.:  (212) 417-8734

**CHRISTOPHER A. FLOOD, ESQ.**
**CLAY H. KAMINSKY, ESQ.**

TO:    HONORABLE JUDGE JED S. RAKOFF
        United States District Judge
        500 Pearl Street
        New York, NY 10007

CC:    PREET BHARARA, ESQ.
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn: **Katherine Reilly, Esq.**
        Assistant United States Attorney

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Agudas Chasidei Chabad v. Russian Federation, ...................................................20
    528 F.3d 934 (D.C. Cir. 2008)

Ahmad v. Wigen, ..........................................................................................15
    910 F.2d 1063 (2d Cir. 1990)

Banco Nacional de Cuba v. Sabbatino, .................................................................15
    376 U.S. 398 (1964)

Barapind v. Enomoto, ....................................................................................17
    360 F.3d 1061 (9th Cir. 2004)

Charlton v. Kelly, .........................................................................................16
    229 U.S. 447 (1913)

Collins v. Loisel, ...........................................................................................16
    259 U.S. 309 (1922)

Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc., ......................................20
    No. 98 Civ. 7664, 1999 WL 673347 (S.D.N.Y. 1999)

Hoxha v. Levi, .............................................................................................17
    465 F.3d 554 (3d Cir. 2006)

Hu Yau-Leung v. Soscia, .................................................................................13
    649 F.2d 914 (2d Cir. 1981)

In re Extradition of Rabelbauer, .......................................................................16
    638 F. Supp. 1085 (S.D.N.Y. 1986)

Konowaloff v. Metropolitan Museum of Art, .................................................16, 17, 20
    702 F.3d 140 (2d Cir. 2012)

Kunstsammlungen Zu Weimar v. Elicofon, ...............................................................19, 20
    536 F. Supp. 829 (E.D.N.Y. 1981), aff'd 678 F.2d 1150 (2d Cir. 1982)

Lo Duca v. United States, ................................................................................14
    93 F.3d 1100 (2d Cir. 1996)

Menzel v. List, ............................................................................................20
    49 Misc. 2d 300 (N.Y. Cnty. Sup. Ct. 1966),
    modified, 28 A.D.2d 516 (1st Dep't 1967), modification rev'd, 24 N.Y.2d 91 (1969)

Ricaud v. American Metal Co., ...................................................................................16
  246 U.S. 304 (1918)

Schoeps v. Museum of Modern Art, ....................................................................19, 20
  594 F. Supp. 2d 461 (S.D.N.Y. 2009)

See Matter of Extradition of Sandhu, ........................................................................17
  No. 90 Cr. Misc. 1, 1997 WL 277394 (S.D.N.Y. May 23, 1997)

Shapiro v. Ferrandina, .............................................................................................17
  355 F. Supp. 563 (S.D.N.Y.)

Skaftouros v. United States, ................................................................................15, 17
  667 F.3d 144 (2d Cir. 2011)

United States v. An Antique Platter of Gold, ..........................................................15, 18
  991 F. Supp. 222 (S.D.N.Y. 1997), aff'd, 184 F.3d 131 (2d Cir. 1999)

United States v. Bennett, ..........................................................................................15
  665 F.2d 16 (2d Cir. 1981)

United States v. Long Cove Seafood, Inc., ..................................................................14
  582 F.2d 159 (2d Cir. 1978)

United States v. McClain, ..........................................................................................18
  545 F.2d 988 (5th Cir. 1977)

United States v. Portrait of Wally, .....................................................................15, 18
  663 F. Supp. 2d 232 (S.D.N.Y. 2009)

United States v. Schultz, ...........................................................................................18
  333 F.3d 393 (2d Cir. 2003)

United States v. Turley, .............................................................................................14
  352 U.S. 407 (1957)

Wright v. Henkel, .....................................................................................................14
  190 U.S. 40 (1903)

## OTHER AUTHORITIES

18 U.S.C. § 2315.........................................................................................14, 15, 18

N.Y. Penal L. § 164.45.................................................................................................14

Restatement (Second) of Conflict of Laws.....................................................................18

Alexander Khochinskiy respectfully submits this Memorandum of Law in support of his motion to dismiss the extradition compliant that the government filed on February 25, 2015, pursuant to the Extradition Treaty between the United States of America and the Republic of Poland (July 10, 1996) (the "Extradition Treaty"). The extradition complaint fails to charge an extraditable criminal offense. Instead, the papers reflect a complex international civil ownership dispute.

STATEMENT OF FACTS

**A.    Two Claims to Title**

At the center of this ownership dispute is Antoine Pesne's "Girl with Dove", a perfectly handsome work of undisputed cultural significance but comparatively low market value. Alexander Khochinskiy is now, and since learning that Poland listed the painting as looted by the Nazis, see Complaint at ¶ 5 (b), has been willing to transfer his copy of the painting to the Republic of Poland. Having inherited good title to the painting from his father, however, Mr. Khochinskiy is also a good faith owner of the painting under Russian law. See Declaration of Alexander Dobrovinskiy ("Dobrovinskiy Decl.") at ¶ 2.

The Republic of Poland mistakes his conflicting claim to the painting for a crime. Yet no amount of prosecutorial enthusiasm can obscure the fact that Mr. Khochinskiy's title to the painting rests on a firm factual and Russian legal basis. Perhaps more troubling for Poland's claim is that the work resides within the Russian Federation itself, as the cultural property law of 1998 presents enormous challenges to lawfully removing "trophy art" from Russia under any circumstances. See Ex. A (Russian Cultural Property Law).

**B.    Cultural Property and Restitution**

Russian law makes compliance with Poland's demands a very complex matter. See Dobrovinskiy Decl. ¶ 3. The Third Reich's conduct of the war on the eastern front has left a

1

legacy of dispute over the title to cultural property that continues to shape modern politics. Russia now prohibits the export of cultural valuables obtained from Germany and its allies during the war.[1] As defined in the Complaint, "Girl with Dove" would likely meet the Russian definition of "cultural property". Id. Mr. Khochinskiy could be subject to criminal penalties in Russia for failing to follow Russian procedure, see Dobrovinskiy Decl. ¶ 3(c), and he has declined to expose himself to such a prosecution by violating Russian law. See Declaration of Alexander Khochinskiy ("Khochinskiy Decl.") ¶ 10.

The Republic of Poland is certainly aware of the legal barriers to its acquisition of "Girl with Dove." They take a different interpretation of governing law. See Ex. B Jacek Miler letter of February 28, 2012). But the ultimate arbiter of Russian law is Russia. Indications that the Russian Ministry of Culture would agree with Poland's interpretation are not favorable. See, e.g., Ex. C (Center for Art Law, "Et tu, Poland?! Poland seeks return of 18 paintings taken by the Soviet Red Army in 1945" (May 20, 2013)). Apprised of the facts, the Russian courts have not supported Poland's claim thus far: "By decision of May 21, 2012 the Court of Preobrazenski Region in Moscow rejected a request for a search of the dwelling of the suspect [for the painting]." Ex. D. (Request for Provisional Arrest and Extradition) at Bates 94. At root, this fundamental divergence between the parties as to the correct interpretation and choice of law bears the classic hallmarks of a civil, not a criminal dispute.

Public statements of Polish officials underscore the fundamentally non-criminal nature of this dispute. On February 28, 2011, the very day a restitution request was issued by the Polish

---

[1] For an illuminating discussion of the origins and development of the unique Russian perspective on this dispute, culminating in the 1998 Russian law on "Cultural Valuables Displaced to the U.S.S.R. as a Result of World War II and Located on the Territory of the Russian Federation," see Professor Elazar Barkan's The Guilt of Nations (JHU Press, 2001), which is excerpted as Ex. E.

2

Ministry of Culture to Mr. Khochinskiy, an interview with officials of the Poznan National Museum was published wherein they acknowledged that "stolen works after the war often passed from hand to hand, and their subsequent owners generally do not have the knowledge of their origin[,]" Ex. F at 2, and that "the law in many countries protect[s] so-called purchasers in good faith." Id. Instead of choosing to return their works to, holders with good title like Mr. Khochinskiy may elect to hold or to sell their artifacts. Thus, in another undated article referencing the painting, a spokesman for the museum suggests that while the Polish government is in talks with Russia, the revendication of the work will "probably remain impossible. Most likely you will need to purchase the image." Ex. G.

The non-criminal nature of the title dispute is confirmed by the initial response of Polish officials to Mr. Khochinskiy's email of May 18, 2010 seeking compensation, who stated that "the Ministry of Culture and National Heritage of the Republic of Poland intends to negotiate with you about the acquisition of the painting[.]" See (Email Exchange) Ex. H at Bates 141. Mr. Khochinskiy responded tentatively that "I think we can discuss the issue of the painting sale to you[.]" Id. at Bates 140. Polish prosecutors now distance themselves from those negotiations, asserting that Ms. Malgorzata Szniak, a cultural attaché with the Polish Embassy in Moscow, "was not authorised to commence negotiations concerning the purchase of the painting "Girl with Pigeon" by Antoine Pesne...the Ministry of Culture and National Heritage...represents the Polish authorities in recovering property lost[.]" See Ex. I (Supplementary Information Request, March 20, 2015) at Bates 153.

Where Poland draws its lines of bureaucratic negotiating authority is not self-evident. Mr. Khochinskiy, however, relied upon Ms. Szniak's affirmative representation of such authorization to invite the Polish delegation to inspect the painting on or about July 22, 2010. See Compl.

¶ 5(d).  After the painting was inspected and photographed, after further information was sought from Mr. Khochinskiy regarding his title to it, see Ex. J (Jacek Miler Request, Oct., 9, 2010) at Bates 155, and after Mr. Khochinskiy responded to that request, see Ex. H at Bates 135-137, "Girl with Dove" was posted on the Interpol list in the Stolen Works of Art database on November 9, 2010 under the reference number 2010/50630-1.1. See Ex. K (Email from AUSA Katherine Reilly).

## C.    Record of Communication

The record of communications between Mr. Khochinskiy and the various officials who held themselves out as representatives of Polish authority is not a model of clarity. See generally Ex. H (Email Exchange) at Bates 135-144; see also Ex. L (Email to Prof. Suchocki). There is a language barrier between the parties, and the adverse positions they have since assumed reveals how little common understanding they may have ever shared as to the possible paths to transfer of the painting. Yet one beneficial feature of the exchange is that it is entirely preserved in writing. See Khochinskiy Decl. at ¶ 8. Poland has attempted to bend this record to support a finding of criminality. To do so, they have consistently reached beyond a fair or even accurate reading of the evidence.

A review of the factual basis for key assertions reveals a patchwork of misinterpretation, exaggeration, and dubious logical leaps that casts more heat than light on the subject of the proper dispensation of "Girl with Dove."

## D.    The Yakov Khochinskiy Provenance

According to the Polish authorities, Mr. Khochinskiy claims that the painting was the property of his mother's family and that his father, Yakov Khochinskiy himself obtained the painting during World War II and brought it back to the Soviet Union. See Compl. ¶ 5(c). This assertion is largely consistent with the position taken by Jacek Miller, the Director of the Cultural

4

Heritage Department at the Ministry of Culture and National Heritage in Warsaw that "the canvass was brought to Russia by your father." See Ex. B (February 28, 2011 Letter). This position is also echoed in the District Prosecutor's Office of Poznan's Request for provisional arrest and extradition of Mr. Khochinskiy issued on June 11, 2013. See Ex. D (Request) at Bates 93, ¶ 3 ("In his letter he claimed that during World War II the painting was brought to Tashkent by his severely wounded father."). As recently as March 5, 2015, responding to questions presumably raised by this litigation, Polish Deputy Circle Prosecutor Mariusz Orlicki attributes the story of Yakov Khochinskiy's acquisition of the painting in Germany and importation of it to Tashkent to Mr. Khochinskiy. See Ex. M (Additional Information) (Question 5: "The painting was to be imported from Germany by his father, who took part in World War II."; Question 6: "He only claims that his father, badly injured in war operations, brought the painting from Germany to Tashkent, located in the former USSR.").

Each of these conclusions is belied by Mr. Khochinskiy's actual statements, in which he has never once claimed to know how, where, or under what circumstances his father obtained the painting, and has never said that his father brought the painting from Germany to Tashkent. In his initial email, Mr. Khochinskiy explains that "Girl with Dove" has been in his collection for many years. See Ex. H at Bates 141. In the sole reference to Tashkent in this email, Mr. Khochinskiy describes the circumstances of his mother's escape from the German invasion of the USSR, fleeing from Kiev "[t]o Tashkent, where [s]he worked until the end of the war in a military hospital saving the lives of wounded soldiers Soviet among which was also my future father seriously wounded at the front." Id. at Bates 142. This email cannot reasonably be interpreted to form the basis of Poland's conclusions.

Mr. Khochinskiy's next reference to Yakov Khochinskiy came on October 24, 2010, in response to Jacek Miler's request for information regarding Mr. Khochinskiy's claim to the painting. Id. at Bates 135 at ¶ 1. Here, Mr. Khochinskiy conveys information about the painting that he received from his father Yakov.

> According to my father, who took part in the Second World War (Patriotic), was injured and became disabled, this painting was in the house occupied by German soldiers. After the attack of Soviet troops on this town, the Germans were defeated. Id.

Notable is what is not said. Mr. Khochinskiy's statement does not attribute to Yakov an eyewitness account of the painting's acquisition. Mr. Khochinskiy does not say that his father told him that he attacked the house occupied by German soldiers or that he was even present at the battle. Rather, what is conveyed here is exactly the kind of folklore about cultural property that could be expected to pass along with the artwork to its eventual recipients without the final possessors ever setting foot in the theater of war – particularly in the former Soviet Union.

That Yakov Khochinskiy had a story to tell about "Girl with Dove" does not equate with him being the ultimate source of the information. Yet the Polish authorities commit a classic interpretive mistake, presuming that proximity of statement in context is equivalent with attribution. But as every young trial lawyer learns when trying to execute an effective impeachment, attributing the source of hearsay is an exact process – one not followed here. Accurately read, nothing in Mr. Khochinskiy's correspondence of October 24, 2010 sustains the inferences the Polish authorities draw from it.

## E.    Yakov Khochinskiy's True War Record

From contemporary medical, industrial, and military records, it is lucidly clear that Yakov Khochinskiy could not have been at the front in 1945 as alleged in the Complaint when "Girl with Dove" was "found by Red Army detachments, taken over by the Soviet party and

moved to the territories of the then Union of Soviet Socialist Republics[.]" <u>Ex.</u> D at Bates 93.

Yakov Khochinskiy was wounded in the Ukraine in 1943. <u>See</u> Declaration of Clay H. Kaminsky,

Esq. ("Kaminsky Decl."). From there he was taken to the hospital at Tashkent, Uzbekistan, a

territory safely away from the war zone. <u>Id.</u> His wound resulted in severe damage to his right

arm. <u>Id.</u>; <u>see also</u> Khochinskiy Decl. at ¶ 3. While in Tashkent, he was employed as an engineer

through at least May, 1944. <u>See</u> Kaminsky Decl. In 1944, he returned to Leningrad for civilian

duty. <u>See id.</u> Subsequent entries documenting Yakov Khochinskiy's movements throughout the

Soviet Union do not support that he travelled outside Leningrad during the remaining period of

the war.

Yakov Khochinskiy did not obtain the painting as interpreted by the Polish authorities.

Mr. Alexander Khochinskiy never led the Polish authorities to draw the conclusions that they

did. Rather, Mr. Khochinskiy, communicating across a language barrier, tried to convey the

limited information that he had. In truth, it was not very much.

## F.     Misstating the History of Negotiations

Communicating with Polish officials, Alexander Khochinskiy made one additional

reference to his personal understanding of how Yakov Khochinskiy came to possess "Girl with

Dove". This was in an email to Professor Wojciech Suchocki, the director of the National

Museum in Poznan. <u>See Ex.</u> N. There, in language that is perhaps more clear that in previous

communications, Mr. Khochinskiy explains his uncertainty of the precise circumstances of how

his father came into possession of the painting, stating

> nobody knows[,] how this painting came to posession [sic] to my father after the
> war. He would use to bring this from Germany in 1945 by himself or received this
> from another Russian officer right on the same time but already in USSR." <u>See Ex.</u>
> L, (April 25, 2012 Email to Prof. Suchocki).

7

His tone shifts to confidence when explaining how the work had been longtime family property:

> Anyway, this painting is at posession [sic] of our family many many years as I am 61 now. We owned of this painting openly and dozens of our neighbors, friends and other people would see this painting on our wall at our apartment or later at my Bogema Art Gallery, Moscow." Id.

The email to Professor Suchocki is not referenced in the Polish charging documents. This is curious at best, as much is made of Mr. Khochinskiy's "ignoring" Poland's restitution demand. See Compl. ¶5(d); Ex. M (Additional Information Question 6) at Bates 116; Ex. D (Request for Provisional Arrest) at Bates 94. It bears observing that what has been deemed the restitution demand itself, by its terms, reads largely as an opposing legal brief and concludes with an expression of "hope that you will soon decide to return the historical canvass, which should constitute part of the collection of the National Museum of Poznan." See Ex. B (Letter of Jacek Miler of February 28, 2012). No deadline, ultimatum, or warning is set forth. No means by which transfer of the painting could feasibly be accomplished are described. Certainly no explanation that Polish criminal liability could theoretically attach is included. In short, the letter does not inherently call for a response.

But the claim that Mr. Khochinskiy "ignored" the letter is counterfactual. Jacek Miler may not have received an immediate response, but of course, he didn't ask for one. Mr. Khochinskiy, however, reached out directly to Professor Suchocki, the head of the National Museum in Poznan. See Ex. L (Suchocki Email). This contact is significant in two ways. First, the National Museum in Poznan operates under Poland's Ministry of Culture and National Heritage. See Ex. N. Poland's repeated claims that "[t]he Ministry of Culture and National Heritage has yet to receive and answer" from Mr. Khochinskiy is simply untrue.

Second, the National Museum is the very location from which "Girl with Dove" was taken in 1943. See Ex. D (Request) at Bates 92; see also Ex. N (Poznan National Museum). Mr. Khochinskiy's contact with Professor Suchocki represents a good faith effort to make himself understood and to negotiate the transfer of the painting. The email is directed to an official who one reasonably could conclude would be in a position to listen and act. It contains a thorough appeal to reason, explaining the principled foundation of Mr. Khochinskiy's position as well as his frustrations with the lack of coherency in the overall Polish response. It conceals nothing of Mr. Khochinskiy's view of the difficulties, but also reveals his desire to return "Girl with Dove" to Poznan. This is hardly "ignoring" Poland's claim or "intending to deprive" Poland of the painting. It far more accurate to describe Mr. Khochinskiy as working very hard in good faith to find a solution to the problem presented by Russian laws on cultural property.

## G.   Unreliable Hearsay and Speculation given Inordinate Weight

Mr. Khochinskiy obtained "Girl with Dove" when he inherited it upon the death of his father Yakov. See Khochinskiy Decl. ¶ 4. Whether stating the same directly, see Ex. L (Suchocki Email) ("A painting by Antoine Pesne 'Girl with Dove' is my property that crossed me from my father"), or by implication from discussing his father's prior ownership, see, e.g., Ex. H at Bates 135, ¶ 1, ("The painting has been in my family for many years."), he has never wavered from this basic truth. He has provided this information, to the best of his ability, whenever asked.

Notwithstanding this record of consistency, Polish prosecutors have made much of a comment that the painting was "purchased at a foreign auction." This statement, something of a logical conundrum when placed in context of the rest of the accusations, presented a mystery in the early stages of this litigation to all parties and the Court. See Mar. 5, 2015 Bail Hearing Transcript at 3–9. Responding to direct questions of the Department of Justice as to the source of this information, Deputy Circle Prosecutor Orlicki admitted that it rests entirely on the

9

statement of an unnamed employee of the shop Bohema. According to Maciej Michalowski, the very Polish official seeking return of the painting, the employee was asked how the painting was obtained and responded "the auction in the West." See Ex. M (Additional Information)(Question 7) at Bates 117.

The Michalowski delegation was able to spend enough time at Bohema to authenticate "Girl with Dove" to its satisfaction. See Compl. ¶ 5(d). Yet, no information was obtained to substantiate the identity of the unknown employee. Maciej Michalowski was not able to provide a name, contact information, or even a description of the employee to the local prosecution office. There is no evidence that he probed any further as to basis of the employee's supposed knowledge. See Ex. M, (Question 7) at Bates 117. Prosecutors subsequently interrogated several staff members of Bohema: Yelizaveta Tairova, Yevgeny Verenitsov, and Dmitry Sorokihave. None of them corroborated the unnamed and unknown employee's statement. Id. No other witness is identified as even corroborating the exchange between Maciej Michalowski and the unknown employee.

There is certainly cause to question the veracity Maciej Michalowski's claim, but more palatable explanations than outright fabrication are available. Misinterpretation, whether from a language barrier or from mistaken meaning, is entirely likely. The Polish delegation's facility with the Russian language has not been established, and we may never know the ability of an unknown employee to understand the question put to him or her, whatever language it was in. An unknown, unnamed employee could have been mistaken, as a number of items in Bohema would be purchased at auction. An unknown employee could also be lying to Michalowski. A combination of these factors is also possible. Regardless, the thin factual basis is well beneath the significance attributed to it by the Polish prosecutors and court.

Yet, astoundingly, as with the Yakov Khochinskiy provenance, Poland compounds evidentiary weakness by recklessly attributing the statement to Mr. Khochinskiy himself. See Ex. O (Decision/Statement of Reasons) at Bates 7 ("*[H]is* claims that he purchased it at a foreign auction are unlikely…") (emphasis added.) This attribution is based on nothing more than pure speculation. See also Ex. M, (Question 6) at Bates 116 ("The antique shop employee, *who undoubtedly had contacts with the suspect*, provided the Polish expert with information that the painting had been acquired on foreign auction.") (emphasis added).

The desire to keep this case simple must have some salience for the Polish authorities. At minimum, the leverage available to a sovereign state involved in a civil dispute with an individual person increases exponentially if even the paltriest theory of criminal liability can be floated across the bargaining table. It is clear that the Poles believe that Mr. Khochinskiy's malfeasance would somehow provide a ready escape from the serious difficulties of Russian cultural property law. See Ex. D (Request for Provisional Arrest) at Bates 93 ("According to the Polish law enforcement authorities, the presented by Alexander Yakovlevich Khochinkiy version of acquisition of the painting "Girl with Dove" is highly unlikely and aims to show legal – in his opinion – origin of the painting as so-called captured property. The conduct of the current holder of the painting is aimed exclusively at its sale.") The problem with Poland's position is that whether the painting is to be deemed cultural property turns on facts as alleged by the Poles themselves, not those raised by Mr. Khochinskiy. See Compl. ¶ 5 (b), see also Ex. O (Decision/Statement of Reasons) at Bates 6; Dobrovinskiy Decl. ¶ 3. Mr. Khochinskiy's subsequent communications go towards compliance with Russian law and a good faith effort to negotiate the painting's transfer.

11

**H.**    **Knowing that the Painting had been Obtained by Means of a Prohibited Act.**

The ultimate question at the heart of the accusation against Mr. Khochinskiy, whether he knew the painting was stolen and rightfully the property of Poland, has no more basis in fact, logic, or fair inference than any other discrete issue in this case.

"Girl with Dove" was the property of Yakov Khochinsky when he died in 1991. Before then, it hung in his apartment in Leningrad for many years. Mr. Khochinskiy's sister-in-law, Bella Borisovna, the wife of his deceased brother Yvgeny, remembers the painting from her very first visit to the Khochinskiy apartment when she met her husband's parents. See Declaration of Bella Borisovna Khochinskaya ("Bella Decl."). She recalls seeing the painting numerous times hung on a wall in the Leningrad apartment until Yakov Khochinskiy's death in 1991. Id.; see also Kaminsky Decl. Ex. G (Death Certificate of Yakov Khochinskiy). She also remembers seeing "Girl with Dove" at Bohema, in Moscow. See Bella Decl.[2]

Ms. Borisovna's adult children, Yakov's grandchildren and Mr. Khochinskiy's nephews, Vladmir and Michail Yevgenievich both attest to seeing the painting in their grandparents' Leningrad apartment. Michail remembers his grandparents as lovers of antiques, and saw the painting numerous times hanging on the wall of their apartment. After Mr. Khochinskiy opened Bohema in Moscow, Michail saw the painting there as well. See Declaration of Michail Yevgenievich Khochinskiy ("Michail Decl."). Vladmir recognizes the painting from both his grandparents' Leningrad apartment and from his uncle Alexander Khochinskiy's Bohema gallery in Moscow. See Declaration of Vladmir Yevgenievich Khochinskiy ("Vladimir Decl.").

As Mr. Khochinskiy has said throughout his communications with Poland, "Girl with Dove" has long been the property of the Khochinskiy family. See e.g. Suchocki email Ex. L.

---

[2] For a photograph of Mr. Khochinskiy at the Bohema gallery, see Ex. P.

12

Mr. Khochinskiy himself inherited the painting from his father. See Khochinskiy Decl. ¶ 4; see also Dobrovinskiy Decl. ¶ 2(a). Because Mr. Khochinskiy and his family have held the painting for so many years, their title to it is likely superior to Poland's under Russian law by prescription. See Dobrovinskiy Decl. ¶ 2(b)-(d).

The Khochinskiy's long and open history of ownership of "Girl with Dove" forecloses a showing even of probable cause that Mr. Khochinskiy had criminal intent when he inherited it. Poland's emphasis that it was listed as stolen is significantly undermined by the facts: it was not listed on Interpol's registry until *after* Mr. Khochinskiy invited the Polish delegation to inspect his copy of the painting, and Mr. Khochinskiy himself initiated negotiations with Poland when he learned that the painting was listed as being looted by the Nazis. That an amicable solution has yet to be found between Mr. Khochinskiy and Poland does not equate with a criminal act.[3] Accordingly, the extradition case should be dismissed.

## ARGUMENT

The dual criminality requirement embodied in Article 2(1) of the Extradition Treaty presents the question: "if the individual had committed the same acts in the United States, would a crime have been committed and would it have been a felony?" Hu Yau-Leung v. Soscia, 649 F.2d 914, 918 (2d Cir. 1981). The answer in this case is a resounding no. A review of Poland's extradition complaint and the documents it incorporates by reference reveals that there is simply no crime here. There is only a civil dispute between competing, good-faith claims of ownership to a painting in the Russian Federation, and the Court may not resolve that dispute in Poland's favor, even provisionally, in light of the Act of State Doctrine. The extradition complaint must therefore be dismissed for failure to charge an extraditable offense.

---

[3] Efforts to negotiate the transfer of the painting to Poland are continuing. See Ex. Q (Email to Polish Prosecutor).

13

A.      **The Elements of an Extraditable Offense**

Article 2(1) of the Extradition Treaty defines an extraditable offense as one punishable under the laws of both Contracting States by imprisonment for a maximum period of more than one year.    This "dual criminality" or "double criminality" requirement is common to U.S. extradition treaties.    The test is whether the alleged conduct would violate an analogous U.S. statute.    Wright v. Henkel, 190 U.S. 40, 58 (1903); Hu Yau-Leung, 649 F.2d at 918; see also Lo Duca v. United States, 93 F.3d 1100, 1111–12 (2d Cir. 1996).

As the government indicated in its March 4, 2015 letter brief regarding bail, the U.S. analog to the Polish offense charged in the extradition complaint is 18 U.S.C. § 2315, the provision of the National Stolen Property Act that criminalizes the receipt of stolen property.[4]    The elements of this offense include (1) that the property in question was stolen, converted, or unlawfully taken, and (2) that the defendant knew that the property in question had been stolen, converted, or unlawfully taken.    See, e.g., Sand's Modern Federal Jury Instructions 54-47.

In order for property to be "stolen" there must be a "felonious taking" of the property "with the intent to deprive the owner of the rights and benefits of ownership."    United States v. Turley, 352 U.S. 407, 417 (1957); United States v. Long Cove Seafood, Inc., 582 F.2d 159, 163 (2d Cir. 1978) (holding that clams harvested in violation of state law were not stolen because no one owned them).    Thus, to determine whether the property in question is stolen, the Court must first determine "the analytically prior issues of (a) whether any person or entity has a property interest in the item

---

[4] The defense bail brief mistakenly referenced Section 165.45 of the New York Penal Code, which criminalizes the possession but not the receipt of stolen property.    Upon further review this statute is not analogous to the charged Polish statute, which criminalize the receipt (or "acceptance") but not the possession of stolen property.    See Compl. Ex. 2 at 3 (providing Article 291 paragraph 1 of the Polish Criminal Code).    The arguments made in the defense bail brief remains valid because 18 U.S.C. § 2315, like N.Y. Penal L. § 164.45, requires defendant to know the property was stolen.

14

such that it can be stolen, and (b) whether the receiver of the item has a property interest in it." United States v. Portrait of Wally, 663 F. Supp. 2d 232, 262 (S.D.N.Y. 2009) (internal quotation marks omitted) In order to be stolen, it is not sufficient that the property in question was stolen at one time; it must remain stolen at the time of the alleged offense. Id. at 259; United States v. An Antique Platter of Gold, 991 F. Supp. 222, 231 (S.D.N.Y. 1997), aff'd, 184 F.3d 131 (2d Cir. 1999).

In order for a defendant to "know" that the property is stolen, he must subjectively believe that there has been an interference with the property rights of its true owner. See United States v. Bennett, 665 F.2d 16, 22 (2d Cir. 1981) ("Because the concept of 'stolen' property requires an interference with the property rights of its owner, property that has been transported, sold, or otherwise disposed of, with the consent of the owner cannot be considered 'stolen' within the meaning of §§ 2312-2315. By the same token, a person who deals with another person's goods with the sincere and genuine belief that he has the owner's consent does not do so knowing the goods to have been 'stolen.'") (internal citation omitted).

## B.    The Act of State Doctrine Bars Extradition

The Court may not certify extradition under 18 U.S.C. § 3184 unless it finds probable cause as to each element of the charged offense. See, e.g., Skaftouros v. United States, 667 F.3d 144, 155 (2d Cir. 2011); Ahmad v. Wigen, 910 F.2d 1063, 1066 (2d Cir. 1990). The Act of State Doctrine bars the Court from making that finding.

The Act of State Doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964). "[W]hen it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be

15

accepted by our courts as a rule for their decision." Ricaud v. American Metal Co., 246 U.S. 304, 309 (1918); Konowaloff v. Metropolitan Museum of Art, 702 F.3d 140, 146 (2d Cir. 2012).

Here, the Soviet Union and its successor state, the Russian Federation, expropriated the painting, transferred it into private hands, and then enacted a law forbidding its expatriation without fair compensation and approval from the Ministry of Culture. See Dobrovinskiy Decl. ¶ 3. The validity of these sovereign acts must be accepted by this Court under the Act of State Doctrine. Together they preclude the Court from finding that the painting is stolen, that Mr. Khochinskiy knew it was stolen, and that Mr. Khochinskiy's request that Poland compensate him for the painting evinced a criminal intent.

Contrary to the government's arguments, see Gov't Letter of March 4, 2015 at 6–7, the Act of State Doctrine is cognizable on this motion to dismiss this extradition complaint. The government has argued that the respondent in an extradition case may not offer affirmative defenses and that the Act of State Doctrine is an affirmative defense, therefore, the government argues, Mr. Khochinskiy may not rely on the Act of State Doctrine here. The flaw in government's syllogism is its equivocation regarding the term "affirmative defense." As used in the extradition decisions, an "affirmative defense" is one which is extrinsic to the elements of the crime charged. See Collins v. Loisel, 259 U.S. 309, 315–17 (1922) (insanity); Charlton v. Kelly, 229 U.S. 447, 461 (1913) (insanity); In re Extradition of Rabelbauer, 638 F. Supp. 1085, 1089 (S.D.N.Y. 1986) (Austrian doctrine of "Active Repentance," involving settlement between defendant and fraud victim). The government's application of this term to the Act of State Doctrine comes from civil cases, in which the doctrine is termed an "affirmative defense" because the defendant bears the burden of proof. See Konowaloff, 702 F.3d at 146.

16

In an extradition case, the government bears the burden of proof on all elements of the offense charged to a standard of probable cause. See Skaftouros, 667 F.3d at 155. Here, the Act of State Doctrine precludes that government from meeting its burden as to essential elements of the offense charged in the extradition complaint. Thus it is not an extrinsic affirmative defense; it obliterates probable cause. See Matter of Extradition of Sandhu, No. 90 Cr. Misc. 1, 1997 WL 277394, at *6 (S.D.N.Y. May 23, 1997) (explaining that the extradition court may consider both explanatory evidence and evidence that "tends to obliterate probable cause," but not evidence that merely contradicts it), quoting Shapiro v. Ferrandina, 355 F. Supp. 563, 572 (S.D.N.Y.), modified & aff'd, 478 F.2d 894 (2d Cir. 1973); see also Barapind v. Enomoto, 360 F.3d 1061, 1069 (9th Cir. 2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); accord Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006).

Moreover, even in the civil cases that treat the Act of State Doctrine as an affirmative defense to be proven by the defendant, "a court may properly grant a motion to dismiss on the basis of that doctrine when its applicability is shown on the face of the complaint." Konowaloff, 702 F.3d at 146. Here, the extradition complaint expressly states that the Russian Army recovered the painting from the Third Reich and "removed [it] to a repository of the former Soviet Union." Compl. ¶ 5-b. That was the sovereign act of a U.S. ally. A second sovereign act must necessarily be inferred from the face of the complaint, the Soviet Union's transfer of the painting into private hands inside the Soviet Union.

## C.     Mr. Khochinskiy Has a Claim to Title of the Painting Under Russian Law.

That the painting became the property of Yakov Khochinskiy and, upon his death, was inherited by Mr. Khochinskiy is an additional and independent basis to dismiss the extradition

17

complaint. Mr. Khochinskiy could not have knowingly received stolen property because he has a claim to title of the painting under Russian law.

As described above, whether a piece of property is "stolen" for criminal law purposes depends in part on the antecedent question whether the whether the receiver or possessor of the item has a property interest in it. Wally, 663 F. Supp. 2d at 262. If Mr. Khochinskiy owns the painting, then of course it is not stolen. For the same reason, his sincere belief that he owns it under Russian law negates any knowledge that it may be stolen, even if he is mistaken. See United States v. Schultz, 333 F.3d 393, 411 (2d Cir. 2003) (admitting "mistake of Egyptian law" defense to negate knowledge that antiquities were stolen under 18 U.S.C. § 2315).

Courts adjudicating criminal and forfeiture matters concerning allegedly stolen property resolve the antecedent questions of ownership under the applicable foreign law. Schultz, 333 F.3d at 400 (applying Egyptian patrimony law concerning antiquities). Wally, 663 F. Supp. 2d at 262 (applying Austrian law of adverse possession); Antique Gold Platter, 991 F. Supp. at 231–32 (applying Italian law concerning artistic and cultural patrimony); United States v. McClain, 545 F.2d 988, 997–1000 (5th Cir. 1977) (examining Mexican law on ownership of pre-Columbian artifacts). Issues of foreign law are questions of law for the Court to decide. Fed. R. Crim. P. 26.1.

Here, the painting has been in the Soviet Union, now Russia, since 1945, and it has been transferred, held, and inherited within that jurisdiction. Accordingly, choice of law principle dictate that the law of the Russian Federation governs ownership of the painting. See Restatement (Second) of Conflict of Laws §§ 245–46 (explaining that the validity of a conveyance of chattels and the effect of such conveyance upon a pre-existing interest in the chattels of a person not a party to the conveyance will usually be determined by the law of the jurisdiction in which the chattel was located at the time of the conveyance); § 246 ("Whether there has been a transfer of an interest

in a chattel by adverse possession or by prescription and the nature of the interest transferred are determined by the local law of the state where the chattel was at the time the transfer is claimed to have taken place."); §§ 260, 263 (explaining that the inheritance of property, whether by will or by intestate succession, is governed by the law of the jurisdiction in which the decedent was domiciled at the time of his death); see generally Kunstsammlungen Zu Weimar v. Elicofon, 536 F. Supp. 829, 845–46 (E.D.N.Y. 1981), aff'd 678 F.2d 1150 (2d Cir. 1982). Moreover, the Russian Federation's 1998 law on "Cultural Valuables Displaced to the U.S.S.R. as a Result of World War II and Located on the Territory of the Russian Federation," is a manifestation of that forum's substantial interest in the application of its law to the disposition of items such as the painting. Cf. Schoeps v. Museum of Modern Art, 594 F. Supp. 2d 461, 468 (S.D.N.Y. 2009) (applying New York law to the transfer of a paintings abroad where significant New York contacts gave that forum a significantly greater interest in the application of its law).

Mr. Khochinskiy has good title to the painting under Russian law. He inherited the painting in 1991 from his father, Yakov Khochinskiy, who had had it on the wall of his Leningrad apartment for many years. It is not known how Yakov Khochinskiy acquired the painting, but it is certain that he did not loot it from Poland. Yakov Khochinskiy's military, medical, and employment records indicate that he was injured fighting in Ukraine on March 17, 1943, and never participated in the later Soviet offensive against the Nazis in Poland and Germany. See Kaminsky Decl. As explained in the attached Declaration of Alexander Dobrovinskiy, Esq., even if Yakov Khochinskiy did not take good title to the painting initially, he and his legal successor in interest, Mr. Khochinskiy, would have later acquired good title to the painting through the Russian doctrine of acquisitive prescription, which is similar to adverse possession. See Dobrovinskiy Decl. ¶ 2. At a minimum, Mr. Khochinskiy is in lawful possession of the painting under Russian law and is

prohibited from conveying the painting to Poland unless and until Poland offers fair compensation and the Ministry of Culture of the Russian Federation authorizes the conveyance. Id. ¶¶ 2–3.

      This is a complex area of law, and it may be that, in appropriate civil case, a court in some jurisdiction may resolve the question of ownership in favor of Poland and against Mr. Khochinskiy. There is substantial civil jurisprudence concerning claims by original owners against good-faith holders of stolen art, sometimes referred to as disputes between "two innocents." Menzel v. List, 49 Misc. 2d 300, 304 (N.Y. Cnty. Sup. Ct. 1966), modified, 28 A.D.2d 516 (1st Dep't 1967), modification rev'd, 24 N.Y.2d 91 (1969). Which innocent prevails varies with the choice of law and the facts of the case. Compare Kunstsammlungen Zu Weimar, 678 F.2d 1150 (applying New York law in favor of original owner's claim), and Schoeps, 594 F. Supp. 2d 461 (applying New York law in favor of original owner's claims where competing Swiss law would have vested title in the purchaser); with Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc., No. 98 Civ. 7664, 1999 WL 673347 (S.D.N.Y. 1999) (applying French law of prescriptive possession in favor of property holder and stating that the same result would apply under the New York doctrine of laches).[5] The Act of State Doctrine and foreign laws concerning the availability of restitution are also often litigated in these civil cases and are also decided in varying ways. Compare Konowaloff, 702 F.3d 140 (dismissing heir of Russian national's claim against museum based on Act of State Doctrine), with Agudas Chasidei Chabad v. Russian Federation, 528 F.3d 934 (D.C. Cir. 2008) (finding genuine issue of material fact with respect to Russia's assertion of

---

[5] As a general matter, common law jurisdictions favor the claim of the original owner while civil law jurisdictions favor the claim of the subsequent good-faith holder. See also, e.g., Solomon R. Guggenheim Foundation v. Lubell, 77 N.Y.2d 311 (1991) (applying New York law and preserving original owner's claim against statute of limitations challenge); Winkworth v. Christie Manson & Woods Ltd., [1980] 1 All E.R. 1121 (Eng.) (applying Italian law, which vested title in the good faith purchaser).

the Act of State Doctrine and holding that Russia's 1998 law conditioning restitution on compensation did not afford an adequate remedy to the plaintiff).

This Court need not decide whether Mr. Khochinskiy would prevail in a civil lawsuit with Poland. It suffices to observe that he may. Mr. Khochinskiy's good faith claim is a complete answer to the extradition complaint because it belies any criminal intent. There is not a crime here; there is only a failed negotiation.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the extradition complaint against Mr. Khochinskiy.

Dated: New York, New York
April 2, 2015

Respectfully submitted,
Federal Defenders of New York

By:

**Christopher A. Flood, Esq.**
**Clay H. Kaminsky, Esq.**
Attorneys for Defendant
**Alexander Khochinskiy**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8734