paragraph 1 of the Criminal Code in connection with article 294 paragraph 1 of the Criminal Code.

In the course of the conducted proceedings the following facts have been determined

The painting by Antoine Pesne „Girl with a Dove" measuring 55 x 45 centimeters was purchased on May 9, 1931 by the Wielkopolskie Museum in Poznań from a private individual for the amount of 3 000 zlotys. The painting was cataloged in the museum's collections and entered in the Book of Acquisitions under number 60. After the breakout of World War II and seizure of Poznań by the German occupant, the collections of the Wielkopolskie Museum were cataloged by the Germans. In 1943 the most precious part of the museum's collections, including the painting „Girl with a Dove", were initially taken to Kahlau, and subsequently deeper into the territory of the III Reich. There, however, as a result of operations of Soviet troops, the collections were largely found by Red Army detachments, taken over by the Soviet party and moved to the territories of the then Union of Soviet Socialist Republics, where they were allocated to individual museums.

As a result of actions taken after the end of World War II, in the years 1946 and 1956 some of the lost collections were recovered within the framework of reclaim action. The successor of the Wielkopolskie Museum in currently the National Museum in Poznań. However, the painting „Girl with a Dove" has not been recovered, because for as yet undetermined reasons in landed in private hands. The canvas was probably stolen after the collections were seized by the Soviet party - either still in the territory of the then Germany or during transport, or in the territory of the former Soviet Union. The painting was placed on the Interpol list in the Stolen Works of Art database as lost in 1943 under the reference 2010/50630-1.1.

In early 2010 the holder of the painting - Alexander Yakovlevich Khochinskiy - advised the Embassy of the Republic of Poland in Moscow that he had the canvas in question at his disposal. From the contents of correspondence conducted by Alexander Yakovlevich Khochinskiy with the Embassy of the Republic of Poland in Moscow it follows that he is interested in selling the painting to the Polish party and obtaining financial compensation for an allegedly lost lot in Przemyśl, whose owners were allegedly his ancestors on the mother's side. At the same time he failed to indicate specific individuals who were to own the lot prior to the outbreak of World War II. Alexander Yakovlevich Khochinskiy was unable to document legal origin of the painting. In his letter he claimed that during World War II the painting was brought to Tashkent by his severely wounded father.

According to the Polish law enforcement authorities, the presented by Alexander Yakovlevich Khochinskiy version of acquisition of the painting „Girl with a Dove" is highly unlikely and aims to show legal - in his opinion - origin of the painting as so-called captured property. The conduct of the current holder of the painting is aimed exclusively at its sale, because - following confirmation of the painting's authenticity by an employee of the National Museum in Poznań - the Ministry of Culture and National Heritage requested the current holder for presentation of documents confirming his title to the painting. On February 28, 2011 the Ministry of Culture and National Heritage forwarded an official restitution request (DDK/701/11/ER). The request contained a description of the painting, its history, indication of the owner at the time of loss of the painting, as well as his successor. The request also contained information that beginning from early post-war years entries about this painting were consistently placed in publications presenting Polish war losses. Attached to the request in question was a number of documents indicating the way of acquisition of the painting by

3

KHOCHINSKY-USAO-000093

the Wielkopolskie Museum in Poznań, and subsequently registration of the painting as lost. One of the enclosures was an opinion drafted by Maciej Piotr Michałowski, confirming that the painting inspected by him during his stay in Moscow on July 22, 2010 was authentic and constituted a war loss of the museum. The request in question was sent to the Ambassador of the Republic of Poland in Moscow with a request to deliver it to the addressee. From the information obtained form the Ministry of Culture and National Heritage on May 19, 2011 it follows that the restitution request in question was served on Alexander Khochinskiy, however remained without response.

As has been established, the painting described above „Girl with a Dove" is in possession of Russian citizen - Alexander Yakovlevich Khochinskiy. The painting itself was located on July 22, 2010 at the „Bohema" antique shop at Smoleńska 12 in Moscow, whose owner is also Alexander Yakovlevich Khochinskiy. The painting in question was presented to Maciej Piotr Michałowski, employed by the National Museum in Poznań in position of curator of the Foreign Art Gallery. The witness went to Moscow on commission of the Ministry of Culture and National Heritage in Warsaw for the purpose of identification of the painting. The witness performed an examination of its authenticity and subsequently drafted an appropriate opinion. The opinion of August 30, 2010 indicates that the painting examined by the witness constitutes the work of Antoine Pesne „Girl with a Dove" being a war loss of the Poznań museum.

The above circumstances led to the addressing to the law enforcement authorities of the Russian Federation of a request for international legal assistance in criminal matters, whose objective was to seize the painting and interview of the owner of the „Bohema" antique shop, Russian citizen Alexander Yakovlevich Khochinskiy. Interview of Alexander Yakovlevich Khochinskiy was not, however, executed by the Russian party, because the above-mentioned was not staying in the territory of the Russian Federation. In the request in question, the Polish party also requested also interview of employees of the „Bohema" antique shop. By decision of May 21, 2012 the Court of Preobrazenski Region in Moscow rejected a request for a search of the dwelling of the suspect. By decision of June 19, 2012 law enforcement authorities of the Russian Federation decided to effect a search of the „Bohema" antique shop for the purpose of finding and seizure of the painting by Antoine Pesne „Girl with a Dove". The record of search drafted on June 19, 2012 indicates that the painting in question was not found. Witnesses Yelizaveta Tairova and Evgeny Verenitsov confirmed that the painting had been present at the showroom for a short time. Witness Yelizaveta Tairova additionally indicated that the painting was not intended for sale, it was presented to an expert from Poland and then several days later it was taken away by representatives of A. Khochinskiy. The location of storage the painting is not known.

Based on the evidence gathered in the case, a decision was issued on charging the suspect with an offense of fencing described in article 291 of the Criminal Code and article 294 paragraph 1 and 2 of the Criminal Code in connection with article 11 paragraph 2 of the Criminal Code.

The offense alleged to Alexander Yakovlevich Khochinskiy carries a penalty of imprisonment from 1 year up to 10 years.

The limitation period for the offense charged to the suspect in the course of the proceedings V Ds. 85/12 lapses on May 18, 2035.

4

KHOCHINSKY-USAO-000094

The investigation in question has not been completed, because actions have not been performed with participation of the suspect Alexander Yakovlevich Khochinskiy. In the course of search activities it was determined that the suspect had no permanent address in the Republic of Poland. Neither is he staying in the territory of the Russian Federation. It was established that the suspect was staying in the territory of the United States of America.

Based on the effected establishments, on request of the District Prosecutor in Poznań, by decision of November 21, 2012 the Regional Court Poznań - Stare Miasto (III Kp 671/12) applied an isolating preventive measure in the form of provisional arrest for a period of 14 days from the date of apprehension.

By decision of January 25, 2013 a search for the suspect was ordered under a wanted person notice and a wanted person notice was issued.

Provisional arrest of the suspect and a search for him under a wanted person notice may take place under article 258 and 279 of the Code of Criminal Procedure inter alia if he is absconding or has no permanent domicile in Poland.

These circumstances arose in the case of the suspect Alexander Yakovlevich Khochinskiy. The hitherto search efforts to locate the suspect, both domestic and international, have been ineffective.

From the information of the Criminal Intelligence Bureau of the National Police Headquarters in Warsaw of April 25, 2013 it follows that the Interpol Bureau in Washington, DC confirms that Alexander Yakovlevich Khochinskiy is in the territory of the United States of America.

The suspect has not been fingerprinted in the territory of the Republic of Poland.

In connection with the circumstances presented above, I request provisional arrest and extradition of the suspect.

At the same time I declare that the content of the present request is compliant with the evidence gathered in the case.

I further assure that Alexander Yakovlevich Khochinskiy shall not, without consent of relevant authorities of the United States of America, be prosecuted for offenses not covered by the present request, and shall not be surrendered to authorities of any other state.


**District Prosecutor**

*-/ illegible signature*

**Krzysztof Grześkowiak**

*Official round seal with the state emblem of the Republic of Poland in the center and the following inscription on the rim: "DISTRICT PROSECUTOR'S OFFICE IN POZNAŃ".*

*Official round seal with the state emblem of the Republic of Poland in the center and the following inscription on the rim: "MINISTER OF JUSTICE".*

5

KHOCHINSKY-USAO-000095

# EXHIBIT E

# THE GUILT OF NATIONS

RESTITUTION AND NEGOTIATING

HISTORICAL INJUSTICES

## Elazar Barkan

The Johns Hopkins University Press
Baltimore and London

Copyright © 2000 by Elazar Barkan
All rights reserved
Printed in the United States of America on acid-free paper

The text of this book is composed in Adobe Garamond with the display set in FC Radiant Condensed
Composition by Allentown Digital Services
Book design by Chris Welch

Originally published in a hardcover edition by W. W. Norton & Company, Inc., 2000
Johns Hopkins Paperbacks edition, 2001

2  4  6  8  9  7  5  3  1

The Johns Hopkins University Press
2715 North Charles Street
Baltimore, Maryland 21218-4363
www.press.jhu.edu

Library of Congress Cataloging-in-Publication Data

Barkan, Elazar.
The guilt of nations : restitution and negotiating historical injustices / Elazar Barkan—
Johns Hopkins paperbacks ed.
p.   cm.
Includes bibliographical references and index.
ISBN 0-8018-6807-6 (pbk. : alk. paper)
1. Political ethics. 2. Human rights—Moral and ethical aspects.
3. International relations—Moral and ethical aspects. 4. Restorative justice.
5. Reparations. 6. Minorities. 7. Postcolonialism. 8. History—Philosophy. I. Title.

JA79.B285 2001

341.6´6—dc21                                2001029261

A catalog record for this book is available from the British Library.

CHAPTER 4

# PLUNDER AS JUSTICE

*Russian Victims and Glorious Museums*

[The Germans] took anything they could pry loose from the myriad palaces and pavilions around Leningrad, right down to the parquet floors . . . mirrors were smashed or machine-gunned, brocades and silk ripped from the walls, . . . [statues] were hauled off to the smelting furnace . . . the depredations around Leningrad were just the beginning. . . .

[In Kiev] museums, scientific institutes, libraries, churches and universities were taken over to be exploited and stripped. Everywhere in the USSR special attention was given to the trashing of the houses and museums of great cultural figures [Pushkin's, Tolstoy's, Chekhov's, Tchaikovsky's . . . among others]. . . .

What was not removed by these specialists . . . continued to be available to the *Wehrmacht* and its camp followers. Even Goebbels criticized these actions: "Our Etappe [support] organizations have been guilty of real war crimes. There ought really to be a lot of executions to reestablish order. Unfortunately the Führer won't agree to this."

Quoted by Lynn H. Nicholas, *The Rape of Europa*

o Goebbels, these war crimes were not atrocities committed by the army, but acts committed by soldiers who preferred to loot cultural and civilian goods than to plunder the country for military use. When the Wehrmacht retreated from Russia, German officials reported that the advancing Soviet troops would find "nothing of value" left behind. The Germans were only partially right. While there was little in Russia to be found, there was a great deal in Germany. Then, when the Soviet Army advanced into Germany,

it embarked on retribution that included the retaking of many Russian trea-
sures as well as much that had never belonged to Russia. The extent of the "ret-
ribution" remained secret and the subject of speculation for the next fifty
years.

Following Russia's 1992 disclosure of the trophy art in its possession, the
West was abuzz with excitement. With numerous masterpieces, hundreds of
thousands of art objects, a couple of million books, including many rare ones,
and miles of archival material, the image of a new Ali Baba's cave was splashed
all over the Western media. By 1995, with major exhibits mounted in
Leningrad and Moscow, and several more exhibits promised in the next few
years, the (re)discovery of the looted art has become perhaps the most impor-
tant cultural event of the nineties. Highlighted by the works of nineteenth-
century classics that recently were the subject of blockbuster exhibits, the
reemergence of so many art objects has engendered excitement in the press,
and magazines and newspapers have been trying to outdo one another with
glittering reports and superlatives. Some have suggested that the newly ex-
hibited art would lead to a rewriting of the art canon. These expectations may
have been overblown, but they can best be understood in their national con-
text and by the moral challenge the (re)discovered art presented to the world.
Framed by the euphoria of the fall of Communism and the allure of a new
post–Cold War world, the (re)discovered treasures raised the dilemma of who
owns the art. The intense politicking in this regard, in Russia and to a lesser
degree in Germany, captured the public imagination. Initially a moral resolu-
tion to the ownership question seemed desirable and feasible, but the window
of opportunity quickly disappeared under political pressure, and with it, the
moral certitude.

The general story has become well known. While liberating Eastern Europe
from the Nazis at the end of World War II, the Soviet Army engaged in retri-
bution against Germans and Germany.[2] There was much to avenge. The Ger-
man invasion of Russia had wreaked unimaginable devastation. Soviet loss of
life amounted to twenty-seven million, and the Soviet people and economy
were in ruins. The damage to cultural property included more than four hun-
dred museums, almost two thousand churches, and hundreds of synagogues,
many in Belarus and Ukraine. Russian cultural and art treasures were plun-
dered, and those that could not be moved were destroyed.[3] Retribution against
Germany was part of an official Russian policy to compensate the Soviet
Union for this unprecedented destruction. The Red Army was ordered to strip
Germany of everything that was valuable and could be moved. In addition to

the industrial equipment and infrastructure, it paid special attention to art and cultural property. In the chaos of postwar Germany, particularly in Berlin in May 1945, several Soviet officials saw themselves as continuing the heroic spirit that had characterized the previous defense of the motherland. They applied this zeal to "save" art objects by removing them from the Western zone and eventually transporting them to Russia. The plunder included the same millions of art objects, books, and archival materials, plus those that Germany had previously owned or wrested from other countries during the war. The extensive plundering by Russia at the war's end included both official and personal property. It is only by hearing the detailed stories that one can fully appreciate the extraordinary effort this transfer and relocation took and the improbable odds against the objects' survival. But even faced with millions of refugees, uncontrolled hatred, and the desire for revenge, the Soviet system, as well as individuals, valued taking the art instead of destroying it.

Today it is hard to regard the transfer and relocation of trainloads of treasures under horrendous conditions that sometimes caused a great deal of damage with any of the heroism that is widely depicted by those who performed the act. How should we think of the pillage? Should the Soviet plunder be understood and legitimized in retrospect? In the pageant of despotic perpetrators, Stalin stands close behind Hitler. How much did the Soviets destroy in other occupied countries in the process of retribution or "reclamation" of their patrimony, and in the meantime how much did they exaggerate their own losses?[4] Understandably observers are queasy when faced with the ethical choice between validating either Soviet injustices or German claims.

The German-Russian dispute is constructed as a national rivalry over national art treasures. The national characteristic imposed upon the trophy art is especially noteworthy because most of the art is actually European in origin and lacks explicit national symbols for either country. Indeed most of the attention during the 1995 Hermitage "Hidden Treasures Revealed" exhibition was devoted to French impressionism. While it is true that the disputed treasure includes numerous works by great German artists, in most cases similar work is found in all major museums, and even when the artist was of German origin, the work has become Europeanized. It is unrealistic to argue that works by sixteenth- or seventeenth-century artists should be restituted along national lines. If that were the case, all museums would have to restitute extensive collections. Germany does not request the return of such works from countries other than Russia, just as France, Holland, and Italy do not demand the return of an art object on the basis of the artist's national origin. These is-

sues have long been settled in agreements among European nations. This dispute is not so much over the national characteristic of the art (which serves more to inflame the debate than to provide grounds for claiming the art) as over the method of its acquisition. At times the Germans frame their claim in national rhetoric and talk about German patrimony. Indeed, included in the disputed art are objects that are famous for being specifically German. But Germany also demands the return of art objects taken by the Soviets regardless of their origin, including art that was previously seized by the Nazis from other locations in Europe, particularly Dutch and privately owned art. Conversely, from the Russian perspective, there is little that can be called Russian by any definition because much Russian art was destroyed. Yet in both countries national pride is projected onto these treasures as though these objects were imbued with the national identity.

The Soviet Army's atrocities against the occupied civilian populations at the end of the war have been the subject of criticism for many years. The question is whether the 1945 plunder ought to be considered part of these atrocities or a legitimate restitution. This raises a larger question: Are there or ought there be certain instances in which ordinary moral considerations are suspended in favor of a "locally moral, legitimate" revenge? There are excellent reasons to assert that no revenge can ever be considered legitimate. Those who hold such an honorable position would find it hard to empathize with any of the parameters of this debate. For those who favor a more contextual approach to morality, the debate could present a significant challenge. Even those who entertain the possibility of a legitimate, limited revenge under national pain, as certainly was the Russian position in 1944–45, face the perplexing dilemma of choosing a criterion by which to evaluate such actions, at the time or a generation later.[5] How are such relative historical (in)justices to be evaluated? Should actions that happened a generation ago be judged wrong or immoral with the passage of time? The answer may depend on the context one chooses.

## POSTWAR: THE ETHICS OF REVENGE AND RETRIBUTION AS ETHICS

There was a wide spectrum of opinions during and at the end of World War II regarding the relative merits of retribution and restitution for war damages and atrocities. The legal and moral questions surrounding the appropriation

of art from Germany by the victorious powers were part of the discussion. Most participants knew that as an abstract principle and from a legal procedural perspective this transfer of artworks violated international standards. Substantively, however, the Nazi horrors tempted a response that went beyond conventional justice, including ethnic cleansing. At the time it was hard to find sympathy for Germany or Germans, and the concept of justice had to explore new frontiers. The Nuremberg trials attempted to render justice according to accepted norms. But even in Nuremberg, under the semblance of judicial procedure, new categories for crimes against humanity were invented, and acts were made illegal retroactively in order to enable retribution against perpetrators of the unimaginable. Today the raw pain and anger directed at Germany have largely subsided, making it hard to empathize, in hindsight, with the actions of the Allies that challenge our current moral convictions.

For a time in Eastern and Central Europe procedural justice was either set aside or reshaped to suit the international community's embrace of a higher, if inexplicable, justice. The actions of "moral" retribution included international agreements to expel millions of peoples across borders because of their nationalities. The expulsion of ethnic Germans from Eastern Europe, for example, was inflicted upon many Third Reich collaborators, but equally so upon millions of innocent individuals. At the time this form of ethnic cleansing, as similar ethnic expulsions have become known, was not considered a crime. Rather, it was done according to an international agreement with little or no protest (cf. the Sudeten Germans). This was justice through retribution. The morality of such justice may have been experienced and shared by many at the end of the war but has become repugnant over time. It is a type of justice to which nations over generations have succumbed but that can hardly be justified in hindsight. Nonetheless, it was hard to oppose at the time, especially when one was faced with the millions of survivors and the painful memories of those who had been subjected to the military brutality, the genocidal policies, and the general suffering of the war. Clearly, certain actions by the Soviet Army amounted to horrendous retribution: mass civilian murders, systematic rapes, and other actions that were criminal at the time and violated even the most widely defined notion of legitimate retribution. No one can view these as anything but war crimes.[6] But they were done by the army and a people that had just survived the worst-known destruction in modern warfare up to that moment. Indeed the plunder of art was less significant than other retributive actions inflicted by the Soviets in 1945. The question is whether the art removal

Case 1:15-mj-00847-JSR   Document 10-3   Filed 04/02/15   Page 12 of 18

ought to be condemned as a war crime, and its consequences reversed if possible, or it was at least an acceptable retribution, given the circumstances.

Evaluating the morality of historical injustices necessitates empathy with the alternatives and constraints that faced the various participants. One possible criterion is to imagine with which of the historical positions one could identify. For example, who in 1945 viewed the action of taking trophy art as immoral or illegal? We have only partial evidence. First, consider the action of the Western Allies regarding cultural property in Germany. The British most strongly rejected retribution through seizure of art. Opinions varied among Americans. Some saw art trophies as a fair component of German reparations. Naked looting was rejected, but other constructions immediately suggested themselves, from removing art objects in order to save them to reparation. The large quantities of art objects that were hidden in mines and other shelters, the fate of which was uncertain, presented an opportunity that led some to advocate their relocation to the United States, with certain stipulations. For example, the director of the Metropolitan Museum of Art and a major force working for the survival of cultural property during the war, Francis Henry Taylor, supported the shipment of art from Germany to the United States. He believed not only that it was up to the government to decide whether or not the art should serve as restitution but that "the American people had earned the right in this war to such compensation if they choose to take it. . . . I believe that we must have the courage to take our own good counsel and act in the best interests of a nation which has lavished its blood and treasure upon an ingrate Europe twice in a single generation."[7]

A large shipment of German-held paintings was sent to the National Gallery in Washington, D.C. The 202 masterpieces included paintings by the van Eycks, Titian, Vermeer, Botticelli, and Rembrandt. The shipment of art generated a protest, known as the Wiesbaden Manifesto, by monuments officers of the U.S. Army who were in charge of dealing with cultural treasures in liberated Europe. The manifesto stated in part that "no historical grievance will rankle so long, or be the cause of so much justified bitterness, as the removal, for any reason, of a part of the heritage of any nation, even if that heritage may be interpreted as a prize of war." The protest swelled. Some even compared the actions of the U.S. Army to the Nazi looting. Even Vyacheslav Molotov, the Soviet foreign minister, protested. Consequently, the deputy American military governor of Germany, General Lucius Clay, referred to the artwork as being "under trusteeship" and planned that it would be returned to

Germany. Even so, the extent, terms, and duration of this appropriation and the terms of return were the subject of intense debate among various government officials and agencies. Under pressure, U.S. Secretary of State James Byrnes promised to return the art "except for such levies as may be made upon them to replace looted artistic or cultural property which has been destroyed or irreparably damaged." The effective protest led to the return of the art, but the legal and ethical question of whether or not the Germans should be responsible for restitution in kind, for losses incurred by the Allies, was never resolved by the Allied Control Council. The Cold War intervened before an agreement was reached, and as a result, art was returned to Germany, but it did not pay any restitution by seceding art.

If U.S. losses elicited voices of retribution, the overwhelming Soviet attitude toward Germany was one of revenge. Stalin's regime was clearly not motivated by what the West considered an enlightened moral consideration toward Germany, and the Soviets never practiced the detachment of impartiality that some in the West believed was appropriate. While Francis Henry Taylor's opinion—that the transaction of cultural reparation for blood was legitimate—represented a minority view among American officials, among the Russians it was the governing policy. In addition to the massive transfer of art by official action, there was comparable looting by individuals as private or semiofficial action. There are various estimates of the extent of the "plunder"—that which was removed by private or semiofficial action—but it was considerable. This plunder was indeed the only category the Soviet Union criticized. The principle of officially removing art was viewed as heroic, but in the continuous intrigue and vying for influence among officials, the accusation of looting was used as a tool of defamation. It seems everyone was subjected to such denunciations, from General Georgy Zhukov, the most popular military hero of the war, to the head of the secret service, Viktor Abakumov. These intrigues reflected the view that personal gain and loot were illegal, but there was never a suggestion that the state action was wrong.

To date we have little direct contemporary evidence of Russian views at that time other than the official policies. But given the authoritarian Soviet regime, one would not expect much diversity, nor is there a reason to believe that Soviet officials did not support stripping Germany of as many resources as possible—economic and cultural—and transporting these to the USSR. Any manifestation of opposition to the regime's policies is therefore significant. A Russian official stated that the secrecy that surrounded these collections was

of such a degree that even curators in the same museum would not discuss the holdings with one another.[8] In this regard an important source is the testimonies narrated by Konstantin Akinsha and Grigorii Kozlov, the two art curators who are largely responsible for disclosing the existence of the secret art to the West.[9] Their efforts to underscore opposition to the plunder predisposed them to emphasize any evidence against the plunder. Therefore the fact that they were unable to excavate or document such critiques suggests, not surprisingly, that few at the end of the war morally objected to the retribution against Germany. A possible exception may have been Vladimir Blavatsky, a Russian art historian and archaeologist, who is said to have been ashamed of his work in the "raid" on German museums; he considers it the dark chapter of his life. But even his self-critique was in retrospect. Most testimonies continue to present the art removal in heroic terms. Akinsha and Kozlov, who distinguish between frontline units and auxiliary forces, suggest another possible proof of opposing views among Soviet officials at the end of the war. They describe the first stage of confiscation by frontline units as selective and partial; these troops intended to leave much of the art collections behind. It was during the second stage that auxiliary units executed complete plunder, intending to leave as little as possible in Germany. The difference between the two stages can be attributed in part to the varying attitudes of those in charge. More important, however, were the changed conditions after the Soviets controlled the area, allowing for a more systematic transfer. Symbolic of this Russian official position was the title of the 1995 exhibit at the Pushkin, "Saved Twice." Although critics in Moscow mocked it by renaming it "Stolen Twice," this criticism was the exception. This story of heroic salvage represents the consistent Russian self-image since the end of the war and up to the present.

## THE DEBATE IN THE NINETIES

The West, as well as the Russian public, first learned of the existence of massive amounts of cultural property in 1991. The initial enlightened impetus, in both Russia and the West, was to return the art. Indeed calling all of it plundered left little room for moral questioning. After all, how could plunder be moral? Yet opposition in Russia to returning the art led to debate and reassessment of the controversy. The only way one can give serious credence to the notion of plunder as justice is by recognizing the dissonance between his-

CRITICAL

torical and contemporary justice. This predicament is shaped by the role of national cultural politics, the historical memory in both countries, and the relative wealth and potential of German reparations to Russia. Also coming into play is the relationship between Russia and the rest of the Commonwealth of Independent States, or CIS (primarily Ukraine), and the Baltic states, since Russia still holds large portions of the cultural heritage of these states.

The international community largely denounced the plunder. Its response to the looted art was being informed primarily by procedural ethics, which is an international standard of codified procedures. By 1996, however, the mood had changed, and the dispute was presented in the West in a more evenhanded manner, weighing the German destruction of Russia against its present demand to return the art. For example, the British newspaper the *Guardian* on April 16, 1996, reported German demands for restitution that were presented by Dr. Wolf-Dieter Dube, a director of the Berlin Museum. It framed the issue by questioning if Dr. Dube had had "the opportunity of seeing the 17th century Russian church blown up by the SS in 1941, or any of the 427 Russian museums destroyed by the German army during the war? He admitted he had not." By 1996 the impartial observer was perhaps less certain about the morality of the German demands. Instead, like any analysis of restitution disputes, resolving the German-Russian dispute involves searching beyond changing public opinion. One ought to examine the authentic views of both parties and look for a narrative that both sides can embrace, at least in part. Indeed such a reciprocal recognition is an essential component of the resolution of any conflict between groups.

The Russian response initially split along the liberal reformist and the conservative nationalist line. On one side stood the reformists, who, in the Russian tradition, are "Westerners" because they appeal to Western values. On the polarized side stood the nationalists, the Slavophiles, who reject those standards. Russian history informed both camps. The first impulse of the reformers was to restitute the art. For Russians who advocate stronger connections to the West, returning the art would provide a golden opportunity in support of Russia's emerging role in the West. For the Slavophiles, retaining the art was restitution for the lost Russian art. The West's initial response followed predictable lines. There was little doubt which Russians should be supported: On one side were the liberal reformers; on the other side were the xenophobic, anti-Semitic nationalists.

As the debate unfolded, it became clear that restitution to Germany was en-

Case 1:15-mj-00847-JSR   Document 10-3   Filed 04/02/15   Page 16 of 18

tangled with numerous other issues. First, there was the relationship among the former states of the USSR. How would the now-separate states deal with Soviet appropriation of all kinds of property, from confiscated private property to the national treasures of the members of the CIS? Unlike other post-Communist societies in which privatization provided a partial mechanism for restitution of property, the minuscule scope of privatization in Russia was hindered by political instability. Secondly, the disputed cultural property falls into separate categories. There are objects that belonged to German museums at the time when they were removed by the Soviets. These include artworks that were originally German as well as those that the Nazis confiscated from German and other Jews and from the occupied countries, such as Holland or France. Still other categories include art objects that belonged to private Germans and works belonging to countries allied with Hitler, like Austria and Hungary. The provenance of many other works is unknown. Altogether there are hundreds of thousands of items of varying significance; the ownership or value of most is unknown and not cataloged at present.[10] The German moral case, as distinct from the legal justification based on international treaties, may not have been strengthened by the demand to return art in all categories including Nazi plunder regardless of how the objects came into German possession. A quick resolution to the question of the trophy art seems unlikely.

The moral ambivalence of returning art is evident even regarding collections that do not carry the stain of Nazi atrocities. Consider the Troy gold. In the spring of 1996 an exhibit of 259 objects from the Trojan gold opened in Moscow. The four-thousand-year-old collection of goblets, flasks, headdresses, and earrings symbolizes the mythological primordial West. Historically the collection belongs to an age a thousand years earlier than the reputed Trojan War. In the 1870s German archaeologist Heinrich Schliemann excavated and exported it from the Ottoman Empire under false pretenses. At the turn of the century he gave the treasure to the Berlin Museum partially as a protective measure. Half a century later Soviet troops confiscated it as part of the World War II retribution. Presently both Germany and Turkey are demanding its return, and both countries have solid legal grounds for their claims. How is the moral ownership of the treasure to be adjudicated?

Not only is the treasure famous for what it is not (i.e., not actually related to Homer's Troy), but its initial acquisition by Germany was fraudulent. This would hardly make the collection exceptional, but it is still worth noting that all parties claim to have the right to own the treasure by one legal construc-

tion or another. It may seem bewildering that each government is relying on fraud or plunder as the legal foundation to claim ownership.[11] But instead of muddying the water, this case may help illuminate the legal fiction that is inevitable in negotiating between different systems and between different eras. Schliemann and Germany looked down on the Orient and the Ottoman Empire. From their colonial perspective, it was reasonable to acquire the treasure by whatever means necessary. In this, Germany was no different from any other European power, though in this case the Berlin Museum may have been more lax. The Berlin Museum was not Schliemann's first choice, but several museums, including the Hermitage, turned down smuggled archaeological treasures. The Russian morality of owning the collection has been transmuted since Russia declined the collection a century ago. One may ask: Should the German attitude regarding acquisitions from colonized or defeated countries of the 1880s inform their contemporary moral judgment? Should analogous morality to that which applied to the acquisition of the collection apply to the Soviet plunder? If so, then it should presumably legitimize the collection's acquisition by the Soviets. If not, should the collection be restituted to Turkey? Historical changes have delegitimized Schliemann's action, which was characteristic of the imperial age. The German demand for the return of art ignores this moral discrepancy. German officials do not explicate, let alone remain consistent to, the moral principle they are applying to differentiate between cultural spoils that are "legally" owned and those that are not and ought to be restituted.

Politics and national pride overshadow the formal legality, as is demonstrated by the polarized German and Russian positions. The Russian claim is that between the collapse of the Third Reich and the establishment of the GDR, the Soviet Union was the legitimate sovereign in the occupied area, hence had the authority to remove the art. Outsiders disagree. The Russian legal claim cannot really be taken seriously because the very reason for international treaties and conventions is to address the outcome of war in which the occupying power is not the recognized sovereign. That Russia is a signatory to these conventions makes its claim even more absurd. Alternatively, the Russians argue, more on emotional than on legal grounds, that the confiscation was a valid reprisal; its essence, if not the particulars, was approved by the Allies in the Yalta and Potsdam conferences at the end of the war. The Germans disagree. Another Russian claim that the Germans counter is that the confiscated art has been validated as "Russian" on the basis of possession over

time, similar to other art collections that, regardless of origin, become part of the national patrimony over time. This is similar to the claim Germany might make regarding the Troy collection. The German response is that the works were presumed lost and therefore did not "exist" in anybody's possession. They insist that international treaties, specifically the Friendship Treaty Germany and Russia signed in 1992 and the Hague Convention of 1907, made the transfer of the works illegal. The Russian government claims that the removal was legal. American legal experts dispute the Russian view, but the impasse is still assured because of the voluntary nature of international law. Even if the dispute could be brought to an international tribunal, unless Russia agreed to be bound by its decision, it would have no impact.

To counter Germany's and others' attempts to strip Russia of the art, the Russian parliament attempted to control the process by formally legalizing Russia's ownership of all art in Russian museums, including "lawfully removed" artworks. The legislation excludes religious objects, art looted by soldiers, or that stolen from victims of the Nazis. The latter could reclaim their property but under very restrictive conditions, while failing to meet these conditions would mean that ownership reverted to the state. The parliament's attempt to legislate the legality of acts that were supposedly lawful in the first place can be construed internationally as an admission of their original illegality. A different interpretation is that the Russian legislation is declaratory. That is, it is a political statement intended foremost for home consumption and only secondarily for the international community and Germany. The purpose is to communicate that Russia will "play by the rules" as long as that suits its politics. The wide Russian support for retaining the art reveals a deep anxiety about the embattled Russian position in the post–Cold War era. Trying to resolve the dispute along formal lines is as irrelevant as the Russian legislation. In both cases the actions supposedly address an international situation while the rhetoric is aimed for the home crowd. For the dispute to be resolved, the solution would have to reconcile the conflicting views of Russia and Germany on how to restitute the victimization of the war.

In the West the disclosure of the looted art initially became synonymous with the work of Akinsha and Kozlov,[12] who were motivated by noble moral sentiments that underscore and privilege the suffering and loss inflicted by one's own country rather than those that were suffered by one's own people. In this case Akinsha and Kozlov focus on the damage perpetrated by Russia and the suffering of the Germans at the end of the war and under Soviet oc-